NO. 07-03-0027-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MAY 12, 2003

______________________________

IN RE: CRAIG W. BARKER, M.D., HIGH PLAINS

RADIOLOGICAL ASSOCIATES AND MULESHOE

AREA HOSPITAL DISTRICT D/B/A MULESHOE

AREA MEDICAL CENTER 

_________________________________

Before QUINN and REAVIS, JJ., and BOYD, S.J.
(footnote: 1)
Opinion

In this original proceeding, relators Craig W. Barker, M.D. (Barker), High Plains Radiological Associates (High Plains), and Muleshoe Area Hospital District d/b/a Muleshoe Area Medical Center (the Hospital) seek a writ of mandamus requiring respondent, the Honorable Gordon H. Green, Judge of the 287
th
 District Court of Bailey County, Texas, to withdraw his order denying relators’ motion to dismiss the cause underlying this action,  dismiss the cause, and award them the sanctions they sought.  For reasons we later recount, we deny the relators’ petition.

In the underlying suit, Calvin A. Meissner (Calvin) and Gereta Meissner (Gereta), the real parties, seek the recovery of damages for alleged medical negligence relating to care given to Calvin.  
See 
Tex. Rev. Civ. Stat. Ann. art. 4590i (Vernon Supp. 2003).  Article 4590i requires that a plaintiff must furnish the counsel for a defendant healthcare provider or physician one or more expert reports, together with a 
curriculum vitae
 for each expert, not later than the 180
th
 day after the date on which a health care liability claim is filed.  
Id.
 §13.01(d).  Section 13.01(g) of the statute provides that if a claimant fails to comply with a deadline established by subsection (d) and, after hearing, the court finds that the failure of the claimant or the claimant’s attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake, the court shall grant a grace period of 30 days to permit the claimant to comply with subsection (d).

As defined in the statute, an “expert report” means a written report that provides a fair summary of the expert’s opinions as of the date of the report regarding 1) applicable standards of care, 2) the manner in which the care rendered by the physicians failed to meet the standards, and 3) the causal relationship between that failure and the injury, harm, or damages claimed.  
Id.
 §13.01(r)(6). In this instance, the real parties filed a report by Dr. William Fleming within the 180-day period. The trial court deemed that first offering insufficient but granted a 30-day extension within which to file additional reports.  Within that 30-day grace period, the real parties filed supplemental reports from Dr. Fleming and Dr. Michael G. Keller.

Neither party disputes that in this type of matter, this court would have jurisdiction to issue a writ of mandamus if it were justified.  Moreover, relators do not challenge the authority of the trial court to grant the 30-day extension of time within which to file an expert report meeting statutory requirements. 

 Rather, relators contend that the expert reports the real parties have 
filed fail to “adequately state how the allegedly negligent medical care caused injury or damage to Calvin,” thereby failing to meet that portion of the §13.01(r)(6) requirements. Thus, the question for our decision is whether the reports filed by the real parties were sufficient to meet the causation requirement. 

A brief recitation of the history of this matter is necessary to a proper discussion of this proceeding.  From the mandamus petition and response, it appears that on February 26, 2000, at approximately 7:50 a.m., Calvin, then 67 years of age, presented at the emergency room of the Hospital complaining of a recent onset severe headache accompanied by nausea and vomiting.  However, he was able to walk into the emergency room.  Barker, then on duty, ordered tests that included a CT scan of the head.  Barker did not believe the CT scan showed a hemorrhage or a midline shift of Calvin’s brain.  He prescribed, and Calvin received, 10 milligrams of Nubain, a pain medication, and 25 milligrams of Phenergan to treat the nausea and associated vomiting.  At 10:00 a.m. and at noon, Calvin was reported to be sleeping.  He remained “unrousable” that afternoon and was admitted to the Hospital at 6:20 p.m. for overnight observation.  At 12:40 a.m. on the morning of February 27, 2000, Calvin was observed having difficulty in breathing and was transferred to Covenant Medical Center in Lubbock. 

At Covenant Medical Center, another CT scan of Calvin’s head was taken and interpreted as showing a subarachnoid hemorrhage with bleeding into the lateral ventricles and basal cisterns of Calvin’s brain.  A neurosurgeon then performed a right frontoventriculostomy, a procedure involving the placement of a drain to remove fluid from the brain.  Calvin never regained his previous physical status and is now confined to a nursing home receiving skilled care.  The gist of the real parties’ suit is that the relators were negligent in failing to timely diagnose the subarachnoid hemorrhage and that failure was the cause of Calvin’s disability.   

In supporting their position that the expert reports were inadequate, relators point out that both Drs. Fleming and Keller contend that Barker breached the applicable standard of care in failing to perform a thorough neurological examination when Calvin  presented at the Hospital, in giving a narcotic pain medication upon his admission, and in failing to recognize that the CT scan showed Calvin had a subarachnoid hemorrhage.  However, they posit, only Fleming said that the Hospital lacked adequate policies and procedures and that it failed to insure Barker was competent to read CT scans.  Further, only Fleming, they say, reasoned that High Plains delayed the proper reading of the CT scan by not getting one of its members to timely read the scan. It is for that reason that we must analyze the relevant parts of Fleming’s reports to see if they are sufficient to satisfy the causation showing required by the statute.

 Relators argue that the expert reports show that the subarachnoid hemorrhage existed before Calvin arrived at the Hospital and that the failure to timely diagnose the hemorrhage led to a delay of some 16 hours between the time Calvin arrived at the emergency room in Muleshoe and the time he was transferred to Covenant Medical Center in Lubbock.   Again, noting that only Dr. Fleming’s reports address the causal connection between the delay in diagnosis and injury caused by that delay, relators posit that although Dr. Fleming’s reports generally state 
that the delay in diagnosis prevented an earlier consultation by a neurosurgeon,  those general statements are not linked to the facts in this case.  Specifically, they say that instead of identifying how this delay precluded earlier treatment, the expert reports only state in general conclusory terms that earlier treatment would have resulted in less permanent neurological injury. Thus, they contend those conclusory statements do not provide an adequate basis for determining the real parties’ claims have merit. 

In relevant part, article 4590(i) requires that a healthcare liability claimant timely file an expert report:

. . . that provides a fair summary of the expert’s opinion as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or healthcare provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Rev. Civ. Stat. Ann. art. 4590(i) §13.01 (r)(6) (Vernon Supp. 2003).

The seminal case in interpreting these statutory requirements is 
American Transitional Care Centers of Texas,
 
Inc. v.
 
Palacios, 
46 S.W.3d 873
 
(Tex. 2001).
  In that case, the court instructed that a trial court’s action in cases of this nature is reviewed under an abuse of discretion standard.  
Id. 
at 875.  The test for an abuse of discretion is not whether in the opinion of the reviewing court the facts present an appropriate case for the trial court’s action.  Rather, it is a question of whether the court acted without reference to any guiding rules and principles.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied, 
476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).  Another way of stating the test is whether the act is arbitrary or unreasonable.  
Id.
  In applying the test, we are cautioned that the mere fact that the trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Id
.  The 
Palacios 
court further explicated that to constitute a good faith effort to meet the statutory requisites, “an expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit.”  
Palacios
, 46 S.W.3d at 875.  The court also wrote that the report “must represent only a good-faith effort to provide a fair summary of the expert’s opinions.” 
 Id. 
at 878.  “A report need not marshal all the plaintiff’s proof, but it must include the expert’s opinion on each of the elements identified in the statute.”  
Id. 

With relation to the causation issue, in his first report dated April 17, 2002,  Dr. Fleming opined:

It is my opinion that had Mr. Meissner’s subarachnoid hemorrhage been immediately recognized, timely neurosurgical intervention could have been obtained, and subsequent permanent neurological deficits and long-term disability would have been avoided.  As a result of my specialized knowledge in this area, based upon my aforementioned qualifications, it is my opinion, with a reasonable degree of medical probability, that but for Dr. Barker’snegligence in diagnosis and treating and obtaining timely neurosurgical consultation, Mr. Meissner’s subsequent neurological deficits and long-term disability would have been avoided.  It is also my opinion that had the Muleshoe Area Medical Center had available a qualified radiologist to interpret the CT scan of February 26, 2000, the subarachnoid hemorrhage would have been recognized on the CT scan, and the appropriate diagnosis would have been made at that time, thereby facilitating the timely diagnosis and neurological evaluation.

In his second report, dated April 22, 2002, as relevant here, Dr. Fleming commented:

The science of medicine encompassing the areas of medical specialties involved in the diagnosis and/or treatment of acute intracerebral hemorrhage, i.e., subarachnoid hemorrhage (i.e.,
 primary care medicine, emergency medicine, family medicine, internal medicine, neurology and/or neurosurgery) recognize causal relationship between the latency between the onset of cerebral hemorrhage and treatment [of] the subsequent injuries sustained from said cerebral hemorrhage.  The applicable medical literature is replete with the generally accepted knowledge based upon scientific inquiry that spontaneous subarachnoid hemorrhage requires early and immediate diagnosis and/or consultation of neurological and/or neuro-surgical services including team intervention by neurosurgeons, radiologists, and neurologists.  Furthermore, the science of medicine recognizes the relationship between the amount of intracerebral blood, delayed diagnosis and the presence of vasospasm and the subsequent severity of global neurological injury and deficit..[sic] In fact, multiple systems for grading the subarachnoid hemorrhage have been devised and the grading systems are related both to surgical risks and the predictive value of the eventually [sic] neurological outcome.  As a result of my specialized knowledge in this area and based upon my aforementioned qualifications and the facts surrounding Mr[.] Meissner’s presentation for evaluation and treatment on February 16, 2000 [sic], it is my opinion to a reasonable degree of medical probability [that] but for the above negligence listed, Mr. Meisner’s [sic] severe neuroglial [sic] injury would not be to the degree it is today.  According to the medical records from the Covenant Health System, Mr. Meisner [sic] is essentially in a vegetative state requiring care in a prolonged skilled nursing facility, including upon discharge in March 2000 the need for ventilatory support.  Furthermore, based upon the science of medicine encompassing the fields involved in the diagnosis and treatment of subarachnoid hemorrhage as indicated above, a reasonable prudent physician or healthcare provider providing ordinary medical care under the circumstances of the instant case would reasonably foresee that the injuries or similar injury sustained by Calvin A. Meisner [sic] would reasonably result from the acts and/or omissions that constitute the medical negligence for the above named defendants as described above.

In contending Dr. Fleming’s report is insufficient in regard to causation, relators cite and rely upon 
Bowie Memorial Hospital v. Wright, 
79 S.W.3d 48 (Tex. 2002), in which the court found an expert report was not sufficient with regard to causation.  In that case, the plaintiff went to Bowie Memorial Hospital after being involved in an automobile accident.  X-rays were taken of her knee and foot, and a fractured patella (knee cap) was diagnosed and surgically repaired.  About a month later, it was discovered that she also had sustained a foot fracture which required two additional surgeries to repair.  The plaintiffs filed suit alleging negligence in the failure to recognize the foot fracture on the x-rays taken at the hospital.  With regard to the issue of causation, the expert report merely stated, “I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright [the plaintiff] would have had the possibility of a better outcome.”  
Id.
 at 51.  The trial court held the report was insufficient and dismissed the cause.  The court of appeals disagreed and reversed the trial court.  In determining the court of appeals erred in its reversal, the high court reasoned that the trial court could reasonably have concluded the report was not sufficient “because the report simply opines that Barbara [the injured party] might have had ‘the possibility of a better outcome’ without explaining how Bowie’s conduct caused injury to Barbara.”  
Id
. at 53.  The court went on to explain that it could not infer from the report that “Bowie’s alleged breach precluded Barbara from obtaining a quicker diagnosis and treatment for her foot,” and reversed the court of appeals and dismissed the lawsuit.  
Id. 
at 53-54.

In contrast to the report in the 
Bowie 
case, Dr. Fleming explains in considerable detail the treatment which was needed if the bleeding had been timely diagnosed, and that medical science “recognizes the relationship between the amount of intracerebral blood,  delayed diagnosis, and the presence of vasospasm and the subsequent severity of global neurological injury and deficit.”  He goes on to conclude that without the negligent failure to recognize the cranial bleeding, and the resulting delay in treatment, Calvin’s injuries would not be as severe as they were.  In this case, the trial court could reasonably have concluded that Dr. Fleming’s reports were sufficient to meet the statutory requirements and did not abuse its discretion in doing so.

For the reasons we have set out, relators’ petition must be, and is hereby, denied.

John T. Boyd

Senior Justice

  

  

 

FOOTNOTES
1:
John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.  Tex. Gov’t Code Ann. §75.002(a)(1) (Vernon Supp. 2003).