**Opinion issued March 21, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-12-00169-CV

————————————————

**MOHAMMAD KHAN, M.D., Appellant**

**V.**

**JOHN RAMSEY AND JENNIFER RAMSEY, Appellees**

On Appeal from the 23rd District Court
Brazoria County, Texas
Trial Court Cause No. 63804

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellant, Dr. Mohammad Khan, M.D., challenges the trial court's order denying his motion to dismiss the health care liability claim[2] made against him by appellees, John Ramsey and Jennifer Ramsey, in their suit for negligence. In his sole issue, Khan contends that the trial court erred in not dismissing the Ramseys' claim.

We affirm.

**Background**

In their original petition, the Ramseys assert a health care liability claim against Dr. Khan, Dr. O.C. Oandasan, M.D., and IPH Home Health Care Services, Inc. ("IPH"), alleging that John was hospitalized on March 30, 2009 for a "suspected stroke." He was ultimately diagnosed with endocarditis, an infection of the heart characterized by heart-valve vegetation growth. On April 9, John underwent "mitral valve surgical debridement" to repair and remove the "vegetation which had grown on his mitral valve." Khan discharged John on April 14, with follow-up treatment to be administered by his primary care physician, Oandasan. From April 14 to April 24, John received treatment at his home from

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (Vernon Supp. 2012).

[2]    *See id.* § 74.001(a)(13) (Vernon Supp. 2012).

IPH, which administered to him two "potent" antibiotics: vancomycin and gentamycin. During this time, John "developed signs and symptoms of severe antibiotic overdose," but IPH "did not take action as required by the standard of care for a home health network." Although IPH "did attempt to communicate information" to Oandasan about John's condition, Oandasan "either failed to review" or "ignored" the information.

By April 24, the levels of vancomycin and gentamycin in John's system were "off the chart," his renal function was "severely compromised," and he felt "lethargic with a cough and fever." IPH staff contacted an on-call doctor for Dr. Oandasan, Dr. Bui, who warned that John "should go to the emergency room 'or he would die.'" John, who was ultimately diagnosed with Stevens-Johnson Syndrome, lapsed into a coma and had to undergo years of treatment and therapy. As a result of the incident, he is "totally disabled" with "persistent vertigo from vestibular damage, left side weakness, cognitive disorder, memory loss, tinnitus, migraine headache syndrome, depression, and other issues all arising from the antibiotic overdose."

The Ramseys allege that Dr. Khan and Dr. Oandasan "deviated from the standard of care for physicians" in their treatment of Ramsey. The Ramseys specifically allege that Khan:

1) failed to communicate abnormal lab results to [Oandasan] and the patient; [and]

3

2) failed to develop, arrange for and assure that a definitive plan was put in place to oversee the administration and monitoring of vancomycin and gentamycin by IV treatment of [John].

The Ramseys further allege that Khan's "deviations from the standard of care," in addition to those of Oandasan and IPH, were "the proximate cause of the severe iatrogenic antibiotic toxicity which resulted in [his] permanent injury and disability."

The Ramseys attached to their petition an expert report[3] authored by Dr. Charles J. Chitwood, M.D., a practicing physician. In the section of his report entitled, "Qualifications," Chitwood notes that he is board certified in Family Medicine, works in a "large Community Medical Center's Department of Family Medicine," has practiced a "full range of family medicine," and has treated "many patients over the years with endocarditis (both native and artificial valves)." He explains that he has "always handled the diagnosis, work-up, treatment and follow-up of serious infectious disease cases with the highest of priority." Based on these and other qualifications, Chitwood asserts that he was "qualified to review and prepare an expert opinion regarding this case."

---

[3] *See id.* § 74.351 (Vernon 2011) (requiring expert report to be served in health care liability claims).

4

In his report, Dr. Chitwood notes that John was first admitted into emergency care on March 19, 2009, exhibiting symptoms that "painted a worrisome picture for endocarditis." However, he was released on oral antibiotics, including vancomycin, with no diagnosis of endocarditis. The physician ordered the pharmacy "'to manage Vancomycin,' indicating an understanding of the meticulous care required when overseeing this drug with multiple potential serious side effects." Subsequently, on March 30, after a follow-up examination, John was referred to Dr. Khan, who performed tests on John that revealed "mitral valve vegetations." Khan began a "broad-spectrum antibiotic regiment," and, on April 9, John underwent mitral valve surgical debridement to remove the heart valve vegetation. He was discharged on April 14 "with a plan for long-term vancomycin and gentamycin" as recommended by the hospital's Infectious Disease Consultant, Dr. Farooq.

Dr. Chitwood notes that Dr. Khan provided an "addendum to the discharge summary . . . months after [John's] release," which he read as an "attempt to underscore all of the risks and concerns that should have been addressed in April." Chitwood explains that on April 10, Dr. Farooq stopped treating John with vancomycin due to "metabolic/allergic concerns." Nevertheless, Khan prescribed vancomycin for John four days later, upon his discharge. Chitwood could see no "rationale" for the change in John's medication. From April 14 to April 24, John

5

was under the care of IPH, which administered vancomycin and gentamycin intravenously pursuant to the hospital discharge plan. During this time, John developed symptoms of antibiotic overdose.

When John began exhibiting symptoms of vancomycin and gentamycin overdose, IPH could not contact Dr. Khan because it had "the wrong contact points." A resident nurse, in an "addendum progress note," wrote that "multiple attempts to notify [Dr. Oandasan] of treatment and lab results were unsuccessful. [Oandasan] stated to notify Dr. Khan or Dr. McFadden. Dr. Khan when contacted stated to notify [Oandasan]." Ultimately, an on-call doctor advised IPH personnel to transport John to an emergency room. On April 24, John was readmitted to the hospital with symptoms of an allergic reaction to the prescribed antibiotics and antibiotic overdose. His lab results demonstrated "severe antibiotic toxicity," and his levels for vancomycin and gentamycin were "astronomically 'off the chart' in fatal toxicity regions." John was then determined to be in critical condition and diagnosed with Stevens-Johnson Syndrome.

In regard to the standard of care applicable to Dr. Khan, Dr. Chitwood explains that "the discharge is a period of transition from hospital to home that involves a transfer in responsibility from the hospitalist to the patient and primary care physician." He explains that Khan "should have gone out of his way in APRIL to make sure continuity and prudent care was arranged." Chitwood notes

6

that the standard of care required Khan "to develop a definitive plan for transition from hospital to home healthcare," which would "include discharge instructions for the patient of the myriad risks and potential complications of long term potential damage from intravenous gentamycin and vancomycin use." However, Khan's discharge summary "did not mention" these facts "until an addendum was written MONTHS after the damage had been done and appears as an attempt to shift blame to the patient after the fact." Chitwood opines that Khan breached the standard of care by failing to properly transition care to Dr. Oandasan, the primary care physician; "assure that arrangements were made for follow-up, monitoring and feedback, given the dangers inherit" in using gentamycin and vancomycin; and "communicate the abnormal lab results" from April 10 "to both the patient and Dr. Oandasan."

In his first amended answer, Dr. Khan generally denied the Ramseys' allegations and asserted that "the incident in issue was caused, in whole or in part, by persons, entities, or factors" beyond his control and John's injuries resulted from "pre-existing conditions and disabilities, and/or the result of intervening new and independent causes." Khan objected to Dr. Chitwood's expert report and moved to dismiss[4] the Ramseys' claims against him, arguing that the report

---

[4]     *See id.* § 74.351(a).

7

constituted "no report" because Chitwood failed to show that he is qualified to render an opinion as to Khan's standard of care, identify the standard of care, or state how Khan breached the standard of care. In their response, the Ramseys asserted that Chitwood's report is adequate. They attached to their response an amended report, along with a request for a 30-day extension[5] to file the amended report, "[s]hould any aspect of [the] initial report be found inadequate."

After a hearing, the trial court granted the Ramsey's request for a 30-day extension to file the amended report. Dr. Khan filed a second motion to dismiss, raising the same objections to the amended report as in his previous motion to dismiss and asserting that the second report "singularly and/or in combination with the earlier filed report . . . still fail[ed] to meet the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code with respect to hospitalist, Mohammad Khan, M.D." The trial court denied Khan's motion.

## Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*,

---

[5] *See id.* § 74.351(c). In their brief, the Ramseys' assert that Dr. Khan did not oppose their request for a 30-day extension.

189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris County Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

## Sufficiency of Expert Report

In his sole issue, Dr. Khan argues that the trial court erred in denying his motion to dismiss the Ramseys' health care liability claim because Dr. Chitwood "lacks the expertise to provide opinions on the standard of care, breach and causation with respect to" Khan. He also asserts that Chitwood's expert report is "conclusory" as to the applicable standard of care and the alleged breach of the standard of care and "wholly fail[s] to address causation."

A health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon 2011); *Gray*, 189 S.W.3d at 858. The expert report must provide a fair summary of the expert's opinions as of the date of the report regarding the

applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

If a defendant files a motion to dismiss challenging the adequacy of the claimant's expert report, a trial court shall grant the motion to dismiss only if it appears to the court, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report. *Id.* § 74.351(l). The only information relevant to the inquiry is that contained within the four corners of the document. *Palacios*, 46 S.W.3d at 878. Although the claimant need not marshal all of his proof in the report, the report must include the expert's opinion on each of the elements identified in the statute. *See id.* at 878–79; *Gray*, 189 S.W.3d at 859.

In setting out the expert's opinions, the report must provide enough information to fulfill two purposes to constitute a good faith effort. *Palacios*, 46 S.W.3d at 879. First, the report must inform the defendant of the specific conduct the claimant has called into question. *Id.* Second, the report must provide a basis for the trial court to conclude that the claim has merit. *Id.* A report that merely states the expert's conclusions does not fulfill these two purposes. *Id.* The expert must explain the basis of his statements to link his conclusions to the facts. *Bowie*,

10

79 S.W.3d at 52. However, a claimant need not present evidence in the report as if he were actually litigating the merits. *Palacios*, 46 S.W.3d at 879. Furthermore, the report may be informal in that the information in the report need not meet the same requirements as the evidence offered in a summary-judgment proceeding or trial. *Id.*

*Qualifications*

Dr. Khan first asserts that Dr. Chitwood "does not possess special knowledge regarding the specific matter on which he is offering an opinion" and is "not qualified to provide an opinion . . . on the basis of training or experience."

In regard to an "expert report" in a health care liability claim, an "expert," "giving opinion testimony about the causal relationship between [an] injury, harm, or damages claimed and [an] alleged departure from the applicable standard of care," must be "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C). "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702; *see also Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996).

11

In regard to the qualifications of an expert witness on causation in a health care liability claim against a physician, the expert witness must be a physician and "otherwise qualified to render opinions on [causation] under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a) (Vernon 2011). On the issue of whether a physician departed from accepted standards of medical care, a person may qualify as an expert witness only if the person is a physician who:

(1)     is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2)     has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)     is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id.* § 74.401(a) (Vernon 2011). In determining whether a witness is to be qualified "on the basis of training or experience," the court shall consider "whether, at the time the claim arose or at the time the testimony is given, the witness . . . (1) is certified by a licensing agency . . . in the area of health care relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c).

An expert report by a person not qualified to testify does not represent a good-faith effort to comply with the definition of an expert report. *Foster v. Zavala*, 214 S.W.3d 106, 116 (Tex. App.—Eastland 2006, pet. denied) (citing

12

*Windisch*, 138 S.W.3d 507, 511 (Tex. App.—Amarillo 2004, orig. proceeding) (interpreting predecessor statute to section 74.351)).

Dr. Khan argues that Dr. Chitwood "does not possess special knowledge regarding the specific matter on which he is offering an opinion" because Khan "is an internal medicine specialist who was practicing as a hospitalist" and Chitwood is a family practice physician. Khan further argues that because Chitwood "has never practiced as a hospitalist," he "is not qualified to state what the standard of care required of Dr. Khan, a hospitalist, regarding the discharge arrangements."

Courts of appeals have recognized that an expert witness need not be a specialist in the particular branch of the medical profession for which the testimony is offered. *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). If the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care. *Id.*; *Blan v. Ali*, 7 S.W.3d 741, 745–46 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

Here, in his expert report, Dr. Chitwood asserts that Dr. Khan breached the pertinent standard of care by failing "to develop a definitive plan for transition from hospital to home healthcare," such as including "discharge instructions for the patient" concerning the risks associated with the antibiotics he was taking. Chitwood also asserts that Khan breached the pertinent standard of care by failing

13

to "assure that arrangements were made for follow-up, monitoring and feedback" and "communicate the abnormal lab results to both the patient and Dr. Oandasan." He further explains that,

> I have personally supervised the medical management of multiple patients with infectious endocarditis, to include developing the treatment plan, ordering, administering and monitoring intravenous antibiotics and writing the detailed home health discharge and follow-up schedules. I have always handled the diagnosis, work-up, treatment and follow-up of serious infectious diseases with the highest of priority.

Because Dr. Chitwood has over eighteen years of medical experience, including ambulatory, urgent, and emergent care, he possesses specialized knowledge on "subject matter [that] is common to and equally recognized and developed in all fields of practice," such as hospital discharge, recognizing the importance of patient history, and the infection process, all of which are addressed in his report. *See Keo*, 76 S.W.3d at 732; *Hersh v. Hendley*, 626 S.W.2d 151, 155 (Tex. Civ. App.—Fort Worth 1981, no writ) (labeling "taking a medical history" and "discharge before complete recovery" as "acts related to practices which are commonly and equally recognized in all fields of practice"); *Garza v. Keillor*, 623 S.W.2d 669, 671 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) ("[T]he standard of care in the infection process . . . is common to and equal in all fields of medical practice").

Additionally, Dr. Chitwood possesses specialized knowledge particular to John's treatment. In his report, Chitwood indicates that he has "supervised the medical management of many patients with infectious endocarditis," for which John was originally hospitalized. Chitwood's medical management included developing treatment plans; ordering, administering, and monitoring intravenous antibiotics; and writing detailed home health discharge plans with follow-up schedules. The Ramseys' claim involves each of these areas of experience. Chitwood's experience also includes consulting with home health companies for patient needs, including the administration of long-term intravenous antibiotics. This claim also involves the coordination between a doctor and a home health services company regarding the dispensation of antibiotics intravenously. Thus, the trial court could have reasonably concluded that Chitwood "has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in [this] claim." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a).

In regard to Dr. Chitwood's "training or experience," we consider "whether, at the time the claim arose or at the time the testimony is given, the witness . . . (1) is certified by a licensing agency . . . in the area of health care relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim." *See id.* § 74.401(c). Here, it is undisputed that Chitwood is

15

currently licensed by the Texas State Board of Medical Examiners in Family Medicine and currently practices "in a large Community Department of Family Medicine." And, as stated above, Chitwood possesses specialized experience relevant to this claim. Chitwood indicates that, "as a Board Certified, independent staff physician" with "over 18 years of ambulatory, urgent and emergent care experience," he has experience with treating endocarditis, including "developing the treatment plan, ordering, administering and monitoring intravenous antibiotics and writing the detailed home health discharge planning and follow-up schedules." Thus, the trial court could have reasonably concluded that Chitwood has established his qualifications to render opinions regarding the standard of care, alleged breach of the standard of care, and causation under section 74.351.

Accordingly, we hold that the trial court did not err in denying Dr. Khan's motion to dismiss the Ramseys' health care liability claim on the ground that Dr. Chitwood is not qualified to render his opinion.

### Standard of Care and Breach

Dr. Khan next asserts that the standard of care articulated in Dr. Chitwood's expert report is "conclusory," "contradictory to the facts as stated," and "fail[s] to identify what actions were required for Dr. Khan to comply with the standard of care." He further asserts that the expert report is "conclusory" as to the alleged

16

breach of the standard of care and "not based upon what [Chitwood] claims was the standard of care."

Identifying the standard of care in a health care liability claim is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios*, 46 S.W.3d at 880. While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. *Id.* When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See Doades v. Syed*, 94 S.W.3d 664, 671–72 (Tex. App.—San Antonio 2002, no pet.); *Rittmer v. Garza*, 65 S.W.3d 718, 722 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

Dr. Khan argues that Dr. Chitwood's report is conclusory because he does not thoroughly define "definitive plan," "fail[s] to state what the potential complications and myriad risks that were supposed to be stated in the discharge instructions," and does not state when the discharge instructions "must be prepared and/or if this information could be verbally communicated to the patient and still meet the standard of care." Khan asserts that the report does not specify "what he was required by the standard of care to do."

In his report, Dr. Chitwood explains,

> The standard of care called for Dr. Khan to develop a definitive plan for transition from hospital to home healthcare. Such a plan would include discharge instructions for the patient of the myriad risks and potential complications of long term potential damages from intravenous gentamycin and vancomycin use. The physician discharge summary did not mention these facts until an addendum was written MONTHS after the damage had been done. . . . In addition Dr. Khan should have arranged for an orderly transition of care to the primary physician by contact with Dr. Oandasan to assure that arrangements were made for follow-up, monitoring and feedback, given the dangers inherit in using these antibiotics. Dr. Khan breached the standard of [care] in failing to assure that such a transition to Dr. Oandasan was accomplished and in failing to communicate the abnormal lab results to both the patient and Dr. Oandasan.

The pertinent standard of care identified by Chitwood required that Dr. Khan "develop a definitive plan for transition from hospital to home healthcare." Chitwood specifies that this plan should have included communicating, in the hospital discharge instructions, the specific risks associated with John's prescribed medication. As noted in Chitwood's report, the specific risks associated with vancomycin toxicity are renal side effects, nervous system damage, hematologic complications, and "red man syndrome," among others. Chitwood further identifies Khan's failure to comply with the standard of care, noting that Khan's addendum to the discharge instructions was not created until "MONTHS after the damage had been done." Chitwood also specifies that Khan's plan for transition from hospital to home healthcare should have included arranging contact with Dr.

18

Oandasan to "assure" "follow-up, monitoring, and feedback," given the known dangers of the prescribed drugs.

Thus, the trial court could have reasonably concluded that Dr. Chitwood's report represents a "good faith effort" to inform Dr. Khan of the specific conduct called into question, the standards of care that should have been followed, and what he should have done differently. Accordingly, we hold that the trial court did not err in denying Khan's motion to dismiss the Ramseys' health care liability claim on the ground that Chitwood's expert report fails to identify the pertinent standards of care and breach of those standards.

*Causation*

Finally, Dr. Khan argues that Dr. Chitwood "wholly fail[s] to address causation" because his report "merely state[s] conclusions regarding what proximately caused the injury." As noted above, an expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of the health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

In support of his argument, Dr. Khan relies on *Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48 (Tex. 2002). In *Bowie*, the plaintiff alleged that a physician's assistant misread or misplaced an x-ray and, therefore, did not discover

19

that the plaintiff had fractured her foot. *Id.* at 50. Approximately one month later, the plaintiff's orthopedic surgeon discovered the fracture. *Id.* The plaintiff filed the report of an expert, who stated that had the x-ray been properly read, she "would have had the possibility of a better outcome." *Id.* at 51. The court, after recognizing that a report need not use any particular phrase, held that the trial court could have reasonably determined that the report did not represent a good-faith effort to summarize the causal relationship. *Id.* at 53. The court noted that the report simply opined that the plaintiff had a "possibility of a better outcome," and did not sufficiently "[link] the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the hospital's] alleged breach (that it did not correctly read and act upon the x-rays)." *Id.*

Here, in contrast, Dr. Chitwood opines in his expert report that, "[i]n all reasonable medical probability, with proper oversight, early detection and response in this case, even as conducted, [John] would not have suffered any of the severe medical maladies resulting from his antibiotic toxicity." He also states that Dr. Khan's breach of the standard of care "[was] the cause in the delayed diagnosis and this delay was the proximate cause of the certainty of permanent disability and need for extensive treatment described herein." He continues, "I believe within a reasonable degree of medical certainty that the above described delays, oversight and submaximal care caused [John's] . . . damages." *See Linan v. Rosales*, 155

20

S.W.3d 298, 305–06 (Tex. App.—El Paso 2004, pet. denied) (affirming verdict in favor of plaintiff for doctor's failure to timely diagnose cancer); *In re Barker*, 110 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, orig. proceeding) (concluding expert report sufficient in stating that negligent failure to recognize medical condition and delay in treatment increased severity of plaintiff's injuries).

In his report, Dr. Chitwood indicates that Dr. Khan failed to develop a discharge plan to include communication of the specific risks associated with vancomycin toxicity, including renal side effects, nervous system damage, hematologic complications, "red man syndrome," and Stevens-Johnson Syndrome, among others. John actually suffered from renal side effects, nervous system damage, hematologic complications, "red man syndrome," and Stevens-Johnson Syndrome. In Chitwood's professional opinion, John suffered these effects "due to a failure of recognition and treatment." He opines that "[i]n all reasonable medical probability, with proper oversight, early detection and response in this case, even as conducted, [John] would not have suffered any of the severe medical maladies resulting from his antibiotic toxicity." Chitwood provides a fair summary of his opinion that Khan failed to meet the standard of care in managing John's discharge from his care and transition to home health, exacerbated by failing to make contact with Dr. Oandasan. He then opines with "proper oversight," John would not have suffered the effects of antibiotic toxicity. Thus, Chitwood has provided Khan a fair

summary of his opinion as to how Khan's improper patient management and oversight caused John's adverse reactions. The trial court could have reasonably concluded that Chitwood, in his report, made a "good faith effort" to provide a fair summary of the causal relationship between Khan's failure to meet the pertinent standards of care and John's injury.

Accordingly, we hold that the trial court did not err in denying Dr. Khan's motion to dismiss the Ramseys' health care liability claim on the ground that their expert report does not address causation.

We overrule Dr. Khan's sole issue.

## Conclusion

We affirm the order of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

22