

# NUMBER 13-19-00095-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CYNTHIA BOYLES, INDIVIDUALLY
AS WRONGFUL DEATH BENEFICIARY
OF JOHN BOYLES, DECEASED, AND ON
BEHALF OF THE ESTATE OF JOHN
BOYLES, DECEASED,                                        Appellant,

v.

CORPUS CHRISTI CARDIOVASCULAR
& IMAGING CENTER MANAGEMENT,                             Appellee.

## On appeal from the 214th District Court
## of Nueces County, Texas

# NUMBER 13-19-00103-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CYNTHIA BOYLES, INDIVIDUALLY
AS WRONGFUL DEATH BENEFICIARY
OF JOHN BOYLES, DECEASED, AND ON
BEHALF OF THE ESTATE OF JOHN
BOYLES, DECEASED,                                              Appellant,

v.

CARDIOLOGY ASSOCIATES OF
CORPUS CHRISTI AND SCOTT
W. MCKINSTRY, M.D.,                                            Appellees.

## On appeal from the 214th District Court
of Nueces County, Texas.

# NUMBER 13-19-00104-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CYNTHIA BOYLES, INDIVIDUALLY
AS WRONGFUL DEATH BENEFICIARY
OF JOHN BOYLES, DECEASED, AND ON
BEHALF OF THE ESTATE OF JOHN
BOYLES, DECEASED,                                                         Appellant,

v.

ABEER KALDAS, M.D.,                                                         Appellee.

On appeal from the 214th District Court
of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Perkes, and Tijerina**
**Memorandum Opinion by Justice Tijerina**

In appellate cause numbers 13-19-00095-CV, 13-19-00103-CV, and 13-19-00104-CV, appellant Cynthia Boyles (Cynthia), individually as wrongful death beneficiary of John Boyles (John), deceased, and on behalf of his estate, appeals the trial court's order granting three motions to dismiss a healthcare liability claim brought by appellees Corpus Christi Cardiovascular & Imaging Center Management (Cardiovascular); Cardiology

Associates of Corpus Christi (CAC) and Scott W. McKinstry, M.D.; and Abeer Kaldas, M.D. By her first two issues in appellate cause numbers 13-19-00103-CV and 13-19-00104-CV, Cynthia asserts the trial court erred in granting Dr. McKinstry, CAC, and Dr. Kaldas's motions to dismiss because the expert reports she filed complied with § 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. By her third issue in appellate cause number 13-19-0095-CV, Cynthia argues that the trial court abused its discretion when it dismissed her healthcare liability claims against Cardiovascular because she asserted vicarious liability. We reverse and remand in all cause numbers.

## I. BACKGROUND

On December 12, 2015, sixty-year-old Boyles was admitted to the emergency department at Christus Spohn Hospital (CSH) and complained of shortness of breath, chest pain, cough, and neck and leg swelling. His medical history included coronary heart disease, bypass surgery, a stroke in 2015 for which he was on anticoagulant therapy (Coumadin), and chronic obstructive pulmonary disease. On December 12, 2015, his labs showed his blood was too thin, and his international normalized ratio (INR) was greater than ten, which indicated he was "over anticoagulated." Boyles was given medication to reduce his fluid levels to treat his congestive heart failure, given medication to reverse his over anticoagulated condition, and had his Coumadin held until his labs showed that the anticoagulation levels in his blood were back in a therapeutic range. Boyles died the following day.

### A. Initial Expert Report

On February 8, 2018, Cynthia filed her original petition, asserting wrongful death, survival,

negligence, and gross negligence claims against appellees.[1] She alleged appellees were negligent in failing to diagnose and treat Boyles's respiratory symptoms thereby causing him to suffer cardiopulmonary arrest.

On July 11, 2018, Cynthia filed an expert report by Stephen A. Goldman, M.D., F.A.C.C., in accordance with § 74.351. *See id*. § 74.351(a) ("In a health care liability claim . . . a claimant shall . . . serve on [a defendant physician] one or more expert reports, with a curriculum vitae of each expert listed in the report."). Dr. Goldman opined, among other things, that Drs. McKinstry and Kaldas failed to recognize that Boyles was exhibiting symptoms of thrombosis and pulmonary emboli (PE) when they examined him and failed to administer an anticoagulant when his labs showed his INR was subtherapeutic. Dr. Goldman opined that their failure to do so resulted in Boyles developing PE and his subsequent death.

## B.    Objections

On August 14, 2018, Dr. Kaldas moved to dismiss the cause contending that the expert reports did not represent a "good faith" effort to comply with the statute. *Id*. § 74.351(l) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report . . . ."). Similarly, CAC, Cardiovascular, and Dr. McKinstry alleged that the expert report failed to adequately address how Dr. McKinstry's acts or omissions were the proximate cause of Boyles's death. Further, they alleged that the report failed to implicate any conduct by CAC and Cardiovascular.

---

[1] Cynthia nonsuited CSH on October 25, 2018.

After a hearing, the trial court granted Cardiovascular's motion to dismiss on November 6, 2018. The trial court also sustained Dr. McKinstry and CAC's objections and gave Cynthia thirty days to cure the deficiencies. *See id*. § 74.351(c) (allowing one thirty-day extension to cure deficiencies in an expert report). On November 20, 2018, the trial court sustained Dr. Kaldas's objections and granted Cynthia a thirty-day extension to cure the report.

## C.      Amended Report

Cynthia served Dr. Goldman's amended expert report on December 7, 2018. Dr. McKinstry and CAC moved to dismiss on the grounds that Cynthia failed to serve the amended report within thirty days. Alternatively, Dr. McKinstry and CAC argued that the amended report still failed to adequately address causation. Dr. Kaldas objected to the amended report on the same grounds.

On January 28, 2019, the trial court held a hearing on Dr. McKinstry, CAC, and Dr. Kaldas's motions to dismiss. Cynthia conceded that the amended report was not timely as to Dr. McKinstry and CAC; however, she reurged that the original report she filed on July 11, 2015 adequately addressed causation. Regarding Dr. Kaldas, Cynthia argued that the amended report adequately addressed causation. Thereafter, the trial court took the matter under advisement.

Three days later, the trial court sustained Drs. McKinstry and Kaldas, and CAC's objections and granted their respective motions to dismiss. This interlocutory appeal followed. *See id*. § 51.014(a)(9) (authorizing an appeal of an interlocutory order denying a motion to dismiss for failure to file a medical expert report under the Texas Medical Liability Act).

6

## II.     STANDARD OF REVIEW AND APPLICABLE LAW

A plaintiff must serve one or more expert reports on a defendant healthcare provider within 120 days of the answer that fairly summarizes: (1) the applicable standard of care; (2) how the defendant physician failed to meet that standard; (3) and the causal relationship between the defendant's breach and the plaintiff's injury. *Id*. § 74.351(a), (r)(6); *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). A report that satisfies these requirements, even if as to one theory only, entitles the plaintiff to proceed with a suit against the defendant physician. *Potts*, 392 S.W.3d at 630. "The expert report requirement is a threshold mechanism" for the trial court to conclude that the plaintiff's claims have merit. *Id.* at 631.

First, the report must inform the defendant of the specific conduct the plaintiff has called into question and must provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). The report need not cover every alleged liability theory, but it must sufficiently describe the defendant's alleged wrongful conduct. *Potts*, 392 S.W.3d at 631. If the trial court determines that a liability theory is supported, then the claim is not frivolous, and the plaintiff's suit may proceed. *Id*.

We review a trial court's decision with respect to chapter 74 expert reports for an abuse of discretion. *Omaha Healthcare Ctr., LLC v. Johnson*, 344 S.W.3d 392, 398 (Tex. 2011); *Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006) (per curiam); *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006) (per curiam)*; Palacios*, 46 S.W.3d at 877. The trial court abuses its discretion if it acts unreasonably, arbitrarily, or without reference to any guiding rules or principles. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142

7

(Tex. 2015) (per curiam). In determining whether the report manifests a good faith effort to comply with the statutory definition of an expert report, we are limited to the contents contained within the four corners of the report. *Palacios*, 46 S.W.3d at 878.

### III. DR. MCKINSTRY AND CARDIOLOGY ASSOCIATES OF CORPUS CHRISTI

By her first issue in cause number 13-19-00103-CV, Cynthia asserts the trial court erred in granting Dr. McKinstry and CAC's motions to dismiss because the expert report explains how Dr. McKinstry breached the standard of care and how Dr. McKinstry's breach caused Boyles to suffer PE and die.[2] It is undisputed that the report set out the proper standard of care. Therefore, we will only address whether the report adequately summarized how Dr. McKinstry breached the standard of care and how his alleged breach caused the injuries. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351.

### 1. Breach of the Standard of Care

First, in his report, Dr. Goldman describes what occurred during Boyles's stay at CSH and what acts Dr. McKinstry performed or failed to perform. When Boyles was admitted to CSH, he was ordered to have a cardiology consultation as well as have his labs repeated, including his INR. He was ordered to restart his Coumadin when his INR was back to a therapeutic range. Boyles was placed on a sequential compression device (SCD).[3] On December 12, 2015, an echocardiogram revealed an "enlargement of all [four] cardiac chambers, diminished right ventricular contractility and left ventricular contractility and severe tricuspid insufficiency."

---

[2] Cynthia concedes the amended report was untimely as to Dr. McKinstry and CAC. Therefore, we analyze the initial expert report filed on July 11, 2018 to determine whether it complies with § 74.351.

[3] A sequential compression device is a method of deep-vein thrombosis (DVT) prevention that improves blood flow in the legs.

Dr. Goldman provided the following in his expert report:

John Boyles had multiple risk factors that predisposed him to the development of blood clots and PE. Mr. Boyles had a history of thrombosis, had heart disease, and was immobile.

. . .

The risk of [PE] and thrombotic complications in patients with a history of thrombosis is well-known. It is well established that patients who are at elevated risk for clot formation who are also unable to move well, who are obese or immobilized, or who have markedly decreased movement in their legs and bodies, should be given anticoagulant treatments. Additional risk factors for the development of blood clots and [PE] include obesity, heart disease, trauma to the leg and/or lower extremities, and peripheral vascular disease. It has been well established that administration of anticoagulant medications like Heparin can prevent clots from forming thereby preventing the development of PE.

. . .

By failing to order Coumadin restarted on the morning of December 13, 2015, Dr. McKinstry breached the standard of care. Mr. Boyles was a patient with multiple risk factors for the development of [PE] notably including a prior history of blood clots. Proper anticoagulation was essential to prevent formation of blood clots for Mr. Boyles. If Dr. McKinstry had met the standard of care and ordered anticoagulation restarted on the morning of December 13, 2015, in reasonable medical probability, Mr. Boyles would not have developed the thrombosis and [PE] that caused his fatal arrest.

Dr. Goldman asserts that when Boyles's INR "obtained at 6:45 a.m. was subtherapeutic at 1.5" and when Dr. McKinstry attended Boyles on the morning of December 13, 2015; therefore, Dr. McKinstry should have immediately restarted Boyles on anticoagulants. Dr. Goldman further asserts that "anticoagulant medication should have been titrated to a therapeutic dose once his over anticoagulation had been corrected," yet Dr. McKinstry failed to resume Coumadin when Boyles was subtherapeutic and inadequately anticoagulated. Dr. Goldman also explained why Dr. McKinstry's failure was a breach of the applicable standard of care: "failure to restart Coumadin in all medical probability, caused the formation of blood clots that blocked the flow of oxygen and caused him to

9

suffer a respiratory arrest on December 13, 2015." Thus, Dr. Goldman's report put Dr. McKinstry and CAC on notice of how he believed Dr. McKinstry breached the applicable standard of care. Because the expert report sufficiently put Dr. McKinstry and CAC on notice of what care was allegedly required but not given, it sufficiently sets out a standard of care and a breach of that standard. *See Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, 382 S.W.3d 619, 629 (Tex. App.—Fort Worth 2012, no pet.).

**2.      Causation and Injury**

Next, Cynthia argues that Dr. Goldman's report explains how Dr. McKinstry's failure to restart the anticoagulant caused him to develop blood clots. As to causation, an "expert must explain, based on facts set out in the report, how and why" a health care provider's breach proximately caused the injury. *Columbia Valley Healthcare Sys., LP v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017). A report should explain how the defendant's action or inaction caused injury. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002) (per curiam). An expert report is sufficient where it "states a chain of events that begin with a healthcare provider's negligence and end in personal injury." *Cornejo v. Hilgers*, 446 S.W.3d 113, 126 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing *McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.)). A court may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.). Furthermore, causation may not be inferred. *Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App.—El Paso 2008, no pet.).

Dr. Goldman's report addressed the issue of causation. First, Dr. Goldman addressed the standard of care applicable to Dr. McKinstry:

The standard of care required Scott McKinstry, M.D., the cardiologist attending to Mr. Boyles to recognize that his INR was subtherapeutic and restart his Coumadin in the morning of December 13, 2015.

In a section titled "Causation" Dr. Goldman opines:

In the human body, oxygenated blood is pumped out of the left ventricle into the aorta and delivered to the body through progressively smaller arteries and arterioles. In the small arteriovenous connections, oxygen is released from the blood to the body and replaced by $CO_2$. Once the oxygen leaves the blood and takes up $CO_2$, it is then venous blood which travels to the right side of the heart, into the pulmonary vasculature, through the lungs where it is absorbs oxygen and then back to the left side of the heart. Muscle action in the legs from movement, walking and raising the feet up and down, is crucial in getting the venous blood to flow back to the heart. When patients lie in bed and do not move around, the venous blood in the legs moves in a very sluggish manner and is more prone to clotting. Once these blood clots develop, with any movement of the body or legs, they can travel to the right side of the heart and then to the pulmonary artery. These blood clots block the small vascular structures in the lungs and prevent the blood from absorbing oxygen. This prevents the body's organs from receiving the oxygen necessary to sustain life and leads to a respiratory arrest. When there is inadequate oxygenation, blood is initially shunted away from lesser organs to preserve those needed to sustain life including the brain. When oxygenation is persistently deprived, the brain will eventually become injured from the absence of oxygen.

The risk of [PE] and thrombotic complications in patients with a history of thrombosis is well-known. It is well established that patients who are at elevated risk for clot formation who are also unable to move well, who are obese or immobilized, or who have markedly decreased movement in their legs and bodies, should be given anticoagulant treatments. Additional risk factors for the development of blood clots and [PE] include obesity, heart disease, trauma to the leg and/or lower extremities, and peripheral vascular disease. It has been well established that administration of anticoagulant medications like Heparin can prevent clots from forming thereby preventing the development of [PE].

Mr. Boyles had several strong and obvious risk factors for [PE] yet his anticoagulation was not restarted when his INR showed he was subtherapeutic, inadequately anticoagulated. The failure to resume Coumadin, in reasonable medical probability, caused the formation of blood clots that blocked the flow of oxygen and caused him to suffer a respiratory arrest on December 13, 2015.

In our view, Dr. Goldman's explanation provides a straightforward link between Dr.

McKinstry's alleged breach of the standard of care and Boyles's injury. Dr. Goldman

asserted that the anticoagulant Coumadin would have prevented thrombosis formation. *See Tenet Hosps. Ltd. v. Barajas*, 451 S.W.3d 535, 547–48 (Tex. App.—El Paso 2014, no pet.) ("The expert report must explain the basis for the causation opinions by linking the expert's conclusions to the alleged breach."). Dr. Goldman explained how Dr. McKinstry's breach—failing to recognize Boyles's INR level and failing to restart Coumadin—in his opinion caused Boyles to develop a blood clot that occluded the pulmonary vasculature, leading, ultimately, to a cardiopulmonary arrest. *See Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 226 (Tex. 2018) (per curiam) (holding that with respect to causation, our "role is to determine whether the expert has explained how the negligent conduct caused the injury"); *Miller v. JSC Lake Highlands Operations,* 536 S.W.3d 510, 512 (Tex. 2017) (per curiam) ("At this preliminary state, whether those standards appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort). In other words, this is more than a mere conclusory assertion. *See Palacios*, 46 S.W.3d at 879.

Appellees assert that Dr. Goldman's report is inadequate because he does not "explain why his theory of thrombosis and [PE] is preferable" to other theories "considering Boyles's multiple comorbidities and cardiovascular issues." However, as previously stated, "if an expert report adequately addresses a single liability theory within a cause of action, the entire case may proceed." *Potts*, 392 S.W.3d at 628. Appellees argue that Dr. Goldman "provides no medical facts to support his conclusion that Boyles actually developed a thrombosis that occluded his pulmonary vasculature," and instead "goes into significant detail explaining the *general* mechanism of thrombosis and [PE]." We disagree.

12

An expert report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Miller*, 536 S.W.3d at 517. Under "this lenient standard," "a document qualifies as an expert report if it contains a statement of opinion by an individual with expertise indicting that the claim asserted by the plaintiff against the defendant has merit." *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011). Dr. Goldman's expert report provides "significant detail" explaining the general mechanisms of thrombosis and PE, and Dr. Goldman stated that risk factors for the development of thrombosis and PE, which Boyles exhibited, include the following: patients unable to move well, patients who are obese or immobilized, patients who have decreased movement in their legs and bodies, patients who have a history of heart disease, patients who have trauma to their legs or lower extremities, and patients with peripheral vascular disease. Dr. Goldman clearly opines that on December 13, 2015, the day Dr. McKinstry attended him, Boyles was anxious, complaining of shortness of breath, chest pain, cough, neck swelling, leg swelling, feeling paresthesia, coldness in his lower extremities, and complaining of lower back pain. Moreover, according to Dr. Goldman, Boyles's prior medical history of blood clots and heart disease, subtherapeutic INR, and placement on a SCD, should have prompted Dr. McKinstry to restart his Coumadin. *See id.* at 631 ("If a healthcare liability claim contains at least one viable liability theory, as evidenced by an expert report meeting statutory requirements, the claim cannot be frivolous."). Thus, according to Dr. Goldman, restarting Coumadin on the morning of December 13, 2015, would have, in all medical probability, prevented the blood clots and PE that were the cause of his arrest on December 13, 2015. *See Miller*, 536 S.W.3d at 516–517 (explaining how and why an expert's opinion that failure to discover an anomaly

13

resulted in a delay and how that delay caused a series of pulmonary issues resulting in death was sufficient to satisfy chapter 74); *see also Abshire*, 563 S.W.3d at 226 ("Whether this explanation is believable should be litigated at a later state of the proceedings."); *Gelman v. Cuellar*, 268 S.W.3d, 123, 130 (Tex. App—Corpus Christi–Edinburg 2008, pet. denied) (holding an expert report adequate regarding the breach of standard of care and causation because it explained that if patient had "been properly monitored and timely treated post-operatively with aggressive respiratory care, she would not have developed respiratory insufficiency," which caused her "anoxic brain damage"); *In re Barker*, 110 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, orig. proceeding) (concluding an expert report sufficient because it explained negligent failure to recognize medical condition and delay in treatment increased severity of plaintiff's injuries). Therefore, we conclude the report adequately links Dr. Goldman's conclusion with the underlying facts: the failure to restart Coumadin on the morning of December 13, 2015 was a substantial factor in Boyles's PE and subsequent death. *Cornejo*, 446 S.W.3d at 123 ("A causal relationship is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and absent the act or omission, the harm would not have occurred."). We sustain Cynthia's first issue.

### IV. DR. KALDAS

In cause number 13-19-00104-CV, Cynthia argues the trial court erred in granting Dr. Kaldas's motion to dismiss because the amended report adequately explains how Dr. Kaldas breached the standard of care and caused Boyles to suffer PE, which resulted in his fatal cardiopulmonary arrest. It is undisputed that Dr. Goldman's report adequately sets out the standard of care. Therefore, we will address breach and causation.

14

1.	**Breach of the Standard of Care**[4]

Like Dr. Goldman's report with respect to Dr. McKinstry, Dr. Goldman also describes what

occurred during Boyles's stay at CSH and what Dr. Kaldas performed or failed to perform.

Additionally, Dr. Goldman provided the following:

By failing to order Coumadin restarted on the morning of December 13, 2015, Dr. Kaldas breached the standard of care. Mr. Boyles was a patient with multiple risk factors for the development of [PE] notably including a prior history of blood clots, heart disease and immobility. Although Mr. Boyles was noted as getting out of bed to use the bathroom, he had been placed on bedrest during the hospitalization and his mobility was very restricted. The notation of waiting on a pump also calls into question whether Mr. Boyles was ever properly placed on SCDs to prevent clot formation. Given his risk factors and lack of properly placed SCDs, proper anticoagulation was essential to prevent formation of blood clots for Mr. Boyles. If Dr. Kaldas had met the standard of care and ordered anticoagulation restarted on the morning of December 13, 2015, in reasonable medical probability, Mr. Boyles would not have developed the thrombosis and [PE] that caused his fatal arrest.

When [Boyles's] INR obtained at 6:45 a.m. was shown to be subtherapeutic at 1.5, he should have been immediately restarted on anticoagulants. When he was complaining of lower extremity coldness and becoming increasingly anxious, Dr. Kaldas should have recognized these symptoms as being consistent with a [DVT] and [PE] and Heparin should have been ordered given STAT.

. . .

Mr. Boyles had several strong and obvious risk factors for [PE] yet his anticoagulation was not restarted when his INR showed he was subtherapeutic, inadequately anticoagulated.

The report provides that Dr. Kaldas examined Boyles on December 13, 2015; Boyles was

complaining of shortness of breath and anxiety. Dr. Kaldas did not make any changes to

his anticoagulant. A nurse notified Dr. Kaldas that Boyles's extremities were cool. She

had difficulty finding the dorsal pedis and posterior tibialis pulses, and Boyles was more

anxious, feeling paresthesia and coldness in the lower extremities, and complaining of

lower back pain. Dr. Kaldas noted Boyles was subtherapeutic and ordered an injection.

---

[4] We refer to Dr. Goldman's amended report to conduct our analysis of whether it complies with § 74.351.

15

According to Dr. Goldman, this injection was never given to Boyles.

According to Dr. Goldman's expert report, Dr. Kaldas breached the standard of care by failing to titrate his anticoagulation medication to a therapeutic dose once his anticoagulation had been corrected; failing to recognize that Boyles's INR was subtherapeutic; failing to immediately restart him on anticoagulants; failing to recognize that Boyles was manifesting symptoms consistent with PE and DVT; and failing to order Heparin "STAT." Dr. Goldman stated that Dr. Kaldas should have recognized that lower extremity coldness and anxiousness are symptoms consistent with DVT and PE, such that it should have prompted Dr. Kaldas to start Boyles on Heparin. Dr. Goldman also explained why Dr. Kaldas's failure was a breach of the applicable standard of care: "if Heparin had been ordered STAT, Mr. Boyles would not have developed the [PE] that caused his arrest and death." Thus, Dr. Goldman's report put Dr. Kaldas on notice of how he believed Dr. Kaldas breached the applicable standard of care. Because the expert report sufficiently notified Dr. Kaldas what care was allegedly required but not given, it sufficiently sets out a standard of care and a breach of that standard. *See Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010).

## 2. Causation and Injury

Appellees argue that Dr. Goldman does not provide facts supporting that, in reasonable medical probability, Boyles experienced or died from a thrombosis or PE and that his opinions are conclusory, speculative, and insufficient. As previously stated, we note the following passages from Dr. Goldman's expert report to support his contention that Boyles suffered from thrombosis and a PE:

In the human body, oxygenated blood is pumped out of the left ventricle into the aorta and delivered to the body through progressively smaller arteries and

16

arterioles. In the small arteriovenous connections, oxygen is released from the blood to the body and replaced by $CO_2$. Once the oxygen leaves the blood and takes up $CO_2$, it is then venous blood which travels to the right side of the heart, into the pulmonary vasculature, through the lungs where it is absorbs oxygen and then back to the left side of the heart. Muscle action in the legs from movement, walking and raising the feet up and down, is crucial in getting the venous blood to flow back to the heart. When patients lie in bed and do not move around, the venous blood in the legs moves in a very sluggish manner and is more prone to clotting. Once these blood clots develop, with any movement of the body or legs, they can travel to the right side of the heart and then to the pulmonary artery. These blood clots block the small vascular structures in the lungs and prevent the blood from absorbing oxygen. This prevents the body's organs from receiving the oxygen necessary to sustain life and leads to a respiratory arrest. When there is inadequate oxygenation, blood is initially shunted away from lesser organs to preserve those needed to sustain life including the brain. When oxygenation is persistently deprived, the brain will eventually become injured from the absence of oxygen.

The risk of PE and thrombotic complications in patients with a history of thrombosis is well-known. It is well established that patients who are at elevated risk for clot formation who are also unable to move well, who are obese or immobilized, or who have markedly decreased movement in their legs and bodies, should be given anticoagulant treatments. Additional risk factors for the development of blood clots and PE include obesity, heart disease, trauma to the leg and/or lower extremities, and peripheral vascular disease. It has been well established that administration of anticoagulant medications like Heparin can prevent clots from forming thereby preventing the development of PE.

John Boyles had multiple risk factors that predisposed him to the development of blood clots and pulmonary emboli, Mr. Boyles had a history of thrombosis, had heart disease, and was immobile, Mr. Boyles'[s] anticoagulation medication should have been titrated to a therapeutic dose once his over anticoagulation had been corrected. When his INR obtained at 6:45a.m. was shown to be subtherapeutic at 1.5, he should have been immediately restarted on anticoagulants. When he was complaining of lower extremity coldness and becoming increasingly anxious, Dr. Kaldas should have recognized these symptoms as being consistent with a deep vein thrombosis and pulmonary embolism and Heparin should have been ordered given STAT. This was not done and, in reasonable medical probability, Mr. Boyles developed a thrombosis that occluded his pulmonary vasculature. In reasonable medical probability, if Mr. Boyles'[s] subtherapeutic coagulopathy been recognized and treated in the morning of December 13, 2015, he would not have developed the blood clots and pulmonary emboli that were, in all probability, the cause of his arrest and death on December 13, 2015.

17

This paragraph establishes a causal connection between Dr. Kaldas's alleged negligence (not restarting him on anticoagulants) and the harm suffered (PE and subsequent death). Moreover, Boyles presented to CSH with shortness of breath with exertion, chest pain, cough, neck swelling and leg swelling with a history of coronary artery disease, bypass surgery, a previous stroke, and he was on an anticoagulant, which, according to Dr. Goldman, Dr. Kaldas should have recognized as symptoms of PE. Additionally, a nurse found his extremities were cool, and she had difficulty locating the dorsal pedis and posterior tibialis pulses. The nurse informed Dr. Kaldas that Boyles was more anxious and feeling paresthesia and coldness in his lower extremities and complaining of lower back pain. Although "Boyles had several strong and obvious risk factors for [PE]," Dr. Kaldas did not start him on an anticoagulant, and according to Dr. Goldman, the failure to do so "caused the formation of blood clots that blocked the flow of oxygen and caused him to suffer a respiratory arrest on December 13, 2015." Thus, we conclude that Dr. Goldman provided sufficient facts to support his contention that Boyles experienced, exhibited symptoms, and died from PE. *See Fagadau v. Wenkstern*, 311 S.W.3d 132, 139 (Tex. App.—Dallas 2010, no pet.) (noting that a report can be good-faith effort even if the expert's opinions could later be proved incorrect). We also note that an expert report is not intended to marshal all of the plaintiff's proof. *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d at 879 ("The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial."). We sustain Cynthia's second issue.

## V.    SUMMARY

As to whether the report is conclusory, we conclude that both reports are sufficiently

18

detailed as to (1) inform appellees of the conduct called into question and (2) allow the trial court to conclude Cynthia's claims have merit. *See Palacios*, 46 S.W.3d at 879. Dr. Goldman clearly articulated that Drs. McKinstry and Kaldas were required to restart Boyles on an anticoagulant once his labs revealed he was subtherapeutic and how the failure to do so in all medical probability caused him to develop blood clots, resulting in his death. *See Zamarripa*, 526 S.W.3d at 460 (holding that the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven"). Because expert reports are simply a preliminary method to show that a plaintiff has a viable cause of action that is not frivolous, we hold that Dr. Goldman's expert report represents an objective good faith effort to inform appellees of the causal relationship between the failure to adhere to the pertinent standard of care and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE. ANN. § 74.351(l). Accordingly, Cynthia's suit against CAC for the actions of Dr. McKinstry may proceed. *See TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 44 (Tex. 2013) (holding that the plaintiff's "suit against [the hospital]—including her claims that the hospital has direct liability and vicarious liability for actions of the nurses—may proceed."). Therefore, we conclude that the trial court abused its discretion when it granted Dr. McKinstry and CAC's motions to dismiss as well as Dr. Kaldas's motion to dismiss Cynthia's causes of action based on their complaints that Dr. Goldman's reports were deficient. We sustain all of Cynthia's issues in cause numbers 13-19-00103-CV and 13-19-00104-CV.

## VI.    CARDIOVASCULAR

By her third issue in cause number 13-19-00095-CV, Cynthia asserts the trial court erred in granting Cardiovascular's motion to dismiss because she alleged vicarious liability claims against Cardiovascular arising from the conduct of Dr. McKinstry. Appellees argue that any purported error in dismissing Cardiovascular was harmless because it did not result in the rendition of an improper judgment as Dr. Goldman's report did not satisfy the requirements of § 74.315.

"When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient." *Gardner v. U.S. Imaging*, 274 S.W.3d 669, 671–72 (Tex. 2008) (per curiam); TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). In other words, "a health care liability plaintiff fulfills her expert report requirement as to a defendant hospital, clinic, or other facility alleged to be vicariously liable if the report is adequate as to the employees alleged to be directly liable." *Women's Clinic of South Tex. v. Alonzo*, No. 13-10-00159-CV, 2011 WL 1106698, at *13–14 (Tex. App.—Corpus Christi–Edinburg Mar. 24, 2011, no pet.) (mem. op.). Thus, to the extent Cynthia alleges that Cardiovascular is liable only vicariously for Dr. McKinstry's actions, the expert report requirement is fulfilled as to Cardiovascular if the report is adequate as to Dr. McKinstry. *See Gardner*, 274 S.W.3d at 672.

Here, Cynthia alleged that Cardiovascular was vicariously liable for the negligence of Dr. McKinstry under the theories of ostensible agency and respondent superior. Because we find that Dr. Goldman's report adequately addressed the statutory expert report elements as to Dr. McKinstry, we find that the trial court abused its discretion in dismissing Cynthia's claims against Cardiovascular. *See Moreno*, 401 S.W.3d at 44 ("[B]ecause the trial court did not abuse its discretion in finding Moreno's reports adequate as to her theory that [the

20

hospital] is vicariously liable for the doctor's actions, her suit against [the hospital]—including her claims that the hospital has direct liability and vicarious liability for actions of the nurses—may proceed."); *McAllen Hosps., L.P. v. Edinburg*, 566 S.W.3d 451, 459 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) ("When a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, and there is an expert report sufficient to support that vicarious liability theory, the entire case may proceed past a motion to dismiss based on the expert report rule."). We sustain Cynthia's third issue.

## VII. CONCLUSION

We reverse the trial court's orders granting appellees' motions to dismiss in appellate cause numbers 13-19-00095-CV, 13-19-00103-CV, and 13-19-00104-CV and remand the case to the trial court for further proceedings.

JAIME TIJERINA,
Justice

Delivered and filed the
30th day of April, 2020.