Opinion issued February 5, 2009








                    




     




In The
Court of Appeals
For The
First District of Texas




NO. 01-08-00680-CV




ANNA MARIA BECKWITH, Appellant

V.

STEPHEN WHITE, M.D., Appellee




On Appeal from the 400th District Court
Fort Bend County, Texas
Trial Court Cause No. 07-DCV-159259




O P I N I O N

          This is a healthcare liability suit governed by Chapter 74 of the Texas Civil
Practice and Remedies Code. See Tex. Civ. Prac. & Rem. Code Ann.
§§ 74.001–.507 (Vernon 2005 & Supp. 2008). Appellant, Anna Maria Beckwith,
appeals from the trial court’s order dismissing her suit against appellee, Stephen
White, M.D. 
          In two issues, Beckwith contends that the trial court erred by dismissing her
suit because (1) Dr. White waived his objections to the qualifications of her expert,
Dr. John Fisher, by failing to timely object and (2) Dr. Fisher “was competent to
render a standard of care opinion as to Dr. White.” 
          We reverse and remand. 
Background
          In May 2006, Dr. White removed a tattoo from Beckwith’s ankle using an
“infrared coagulator device.” Dr. White informed Beckwith that “spots of second
degree burn w[ould] be created in order to break up the tattoo ink.” 
          After the procedure, Beckwith experienced discoloration of the skin,
disfigurement, and severe pain. Beckwith sought treatment from Dr. Glen Garner,
who determined that Beckwith had suffered third-degree burns, “full thickness skin
necrosis,” and infection in her ankle. Dr. Garner’s treatment of the ankle included
performing a skin graft from Beckwith’s thigh.
 
          Beckwith sued Dr. White for negligence. In her original petition, filed on
September 14, 2007, Beckwith alleged that “Dr. White’s use of an infrared coagulator
was below the standard of care for physicians in the same or similar circumstances
as him because the extremely crude nature of the device exposes the patient to an
increased risk of injury”; that “Dr. White failed to use an ultra-short pulsed Nd:YAG
laser, which delivers a pulse duration so short that almost no heat is transferred to the
skin”; and that Dr. White’s use of the infrared coagulator caused “full thickness skin
necrosis,” the treatment of which required a skin graft.
          On October 30, 2007, Beckwith served Dr. White with the original petition and
the expert reports and curricula vitae of Glen Garner, M.D., and John C. Fisher, Sc.D. 
          According to his report and curriculum vitae, Dr. Garner is a graduate of the
University of Oklahoma medical school, has been licensed to practice medicine in
Texas since 1998, has been actively engaged in the practice of surgery since 2002,
and is certified by the American Board of Surgery. With regard to this case, Dr.
Garner attested as follows: 
[T]he standard of care for tattoo removal and use of lasers and other
devices is well-documented and supported in the medical literature . . .
[but] is however beyond the scope of my practice and I therefore cannot
render an opinion on its proper use, indications for use, or associated
complications and their incidence.
In very brief summary, I have reviewed the single page handwritten
notes by Dr. White . . . . It describes the tattoo evaluation, treatment
with infrared coagulator tattoo removal device, and subsequent follow-up evaluation respectively. My only concern is noted on the informed
consent page, line 2 describing spots of “second degree burn” are to be
created by the coagulator device to disrupt the tattoo ink. As
documented in my initial evaluation of Mrs. Beckwith, her wound in the
area of the previously treated tattoo exhibited full thickness (i.e. 3rd
degree burn) skin loss, necrosis and early wound infection . . . . 
[Discussion of the standard of care as it seems to relate to Dr. Garner’s
own treatment of Beckwith’s wound.]
It is my opinion that the resulting full thickness skin necrosis and tissue
loss following tattoo removal is not an expected or acceptable outcome
in any patient. This opinion is based on my knowledge and experience
in wound management and the management of burn patients.

          According to the report and curriculum vitae of Dr. Fisher, Dr. Fisher has a
master’s degree in electrical engineering and a doctorate in applied physics from
Harvard University and is a “Consultant in Laser Medicine and Surgery.” Dr. Fisher
has taken approximately 160 medical education courses focusing on laser surgery and
treatment. Among the numerous affiliations he lists, Dr. Fisher is a founding member
and the president of the American Board of Laser Surgery (the sole medical testing
board in the United States for laser surgery); a founding fellow of the American
Society for Laser Medicine and Surgery; a member of the surgical staff at St.
Barnabas Medical Center, Livingston, New Jersey; a former member of the consulting
staff of St. Luke’s Medical Center, Milwaukee, Wisconsin; and a former fellow of
laser medicine and surgery at the University of Cincinnati Medical College. Dr.
Fisher lists 37 publications that he has authored in the area of laser medicine and
surgery, and lists some 250 courses and seminars on laser medicine and surgery that
he has presented at hospitals and university medical programs worldwide, including
Mt. Sinai Medical Center, New York City, and Boston University Medical Center. 
Dr. Fisher states that he has served as an expert witness in several legal actions
brought against physicians for various allegations of malpractice involving the use
of lasers and electrosurgery, including thermal injuries and dermal scarring from
resurfacing.

          In his report, Dr. Fisher opined, in relevant part, that “[i]t was dangerous and
inappropriate to use an infra-red coagulator to remove the tattoo from the leg of the
plaintiff, Anna Beckwith” and that it was “not the proper treatment for tattoo removal
without patient injury.” Dr. Fisher states that “The correct procedure for removal of
a tattoo without injury to the patient is to use an ultra-short pulsed Nd:YAG laser”
because “the pulse duration is so short that almost no heat is transferred to the
adjacent skin.” According to Dr. Fisher, “Dr. White evidently did not have sufficient
laser experience to know the proper technique for removal of tattoos without serious
injury to the patient. His technique in my opinion was crude in the extreme.”

          On November 28, 2007, Dr. White objected to the sufficiency of the expert
reports. Specifically, Dr. White contended that the reports of Drs. Garner and Fisher,
“taken together,” (1) did not delineate the standard of care; (2) did not explain how
that standard of care was breached by [Dr. White]; (3) gave only conclusory opinions
regarding causation; and (4) did not hold opinions to a reasonable degree of medical
probability.” Dr. White moved to dismiss Beckwith’s suit on the basis that she had
failed to timely file an expert report that complied with Civil Practice and Remedies
Code section 74.351. After a hearing, the trial court denied the motion.

          On April 22, 2008, Dr. White filed a second motion to dismiss on the basis that
Dr. Fisher failed to state in his report that he is familiar with the infrared coagulator
used in this case and on the basis that Dr. Fisher is not a physician, as required under
section 74.401 of the Civil Practice and Remedies Code, and is therefore not qualified
to render an expert report. 

          On May 5, 2008, the trial court held a hearing on Dr. White’s second motion
to dismiss, but did not make a ruling. At a hearing on June 16, 2008, the trial court
announced its finding that Dr. White had “waived the objection by failing to object
timely” and that, even though Fisher is not an M.D., . . . the report constitutes a report
as contemplated by the statute.” The court stated that its reason for admitting Fisher’s
testimony was “Fisher’s unique knowledge of lasers and his experience teaching
physicians, and the case involves, the way I understand it, [Dr. White’s] choice of the
laser machine used, rather than his medical decision on how to use the machine.” At
the hearing, Dr. White asked the court to reconsider its holding on the basis that the
infrared coagulator was not actually a laser. At the close of the hearing, the trial court
granted Beckwith 30 days to amend Dr. Fisher’s report to demonstrate Dr. Fisher’s
familiarity with the infrared coagulator. 

          Subsequently, Beckwith submitted an amended report of Dr. Fisher, in which
he attested as follows, in relevant part: 

Yes[,] I am familiar with an infrared coagulator. It is a thermal emitter
of radiation . . . used to coagulate bleeding by the heat produced on the
target tissue. . . . [discussion of mechanics]. It is used primarily for
treating hemorrhoids. When used far less frequently for cosmetic
purposes such as tattoo removal, the device induces burns to the skin
around the area of the tattoo, seeking to remove the pigment by burning
away the skin. . . . The i.r. coagulator used in this case with Anna
Beckwith was in my opinion not the proper choice for tattoo removal. 
The proper device would have been a short pulsed Nd:YAG laser . . .
[discussion of rationale]. What Dr. White did by using the i.r.
coagulator was to cause thermal death of the skin of Mrs. Beckwith by
heat . . . . In my opinion, any competent laser dermatologist physician
would know the proper equipment and technique to use.

          On July 15, 2008, Dr. White moved to dismiss the suit on the basis that Dr.
Fisher’s statements in the amended report were conclusory and that the report did not
rectify that Dr. Fisher is not a physician. Beckwith maintained that these objections
were not timely raised and therefore had been waived.

          On July 28, 2008, after a hearing, the trial court dismissed with prejudice
Beckwith’s suit against Dr. White. This appeal ensued. 

 
Timeliness of Objections

          In her first issue, Beckwith contends that the trial court erred by dismissing her
suit because Dr. White waived his objections to the qualifications of her expert, Dr.
John Fisher, by failing to timely object.

A.      Standard of Review

          We review a trial court’s decision on a motion to dismiss a case for failure to
comply with section 74.351 for an abuse of discretion. Am. Transitional Care Ctrs.
of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex. 2001) (applying abuse of
discretion standard in review of trial court’s decision to dismiss under predecessor
statute, section 13.01(e) of article 4590i); Torres v. Mem’l Hermann Hosp. Sys., 186
S.W.3d 43, 45 (Tex. App.—Houston [1st Dist.] 2005, no pet.). A trial court abuses
its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules
or principles when it dismisses a claim. Torres, 186 S.W.3d at 45. However, to the
extent that resolution of the issue requires us to construe statutory language, we
review under a de novo standard. Id. 

B.      Applicable Law

          Section 74.351 of the Civil Practice and Remedies Code provides as follows,
in relevant part:

(a)     In a health care liability claim, a claimant shall, not later than
the 120th day after the date the original petition was filed, serve
on each party or the party’s attorney one or more expert reports,
with a curriculum vitae of each expert listed in the report for
each physician . . . against whom a liability claim is asserted.
. . . Each defendant physician . . . whose conduct is implicated
in a report must file and serve any objection to the sufficiency
of the report not later than the 21st day after the date it was
served, failing which all objections are waived.
(b)     If, as to a defendant physician . . . , an expert report has not been
served within the period specified by Subsection (a), the court,
on the motion of the affected physician . . . , shall, subject to
Subsection (c), enter an order that: (1) awards to the affected
physician . . . reasonable attorney’s fees and costs . . . ; and (2)
dismisses the claim with respect to the physician . . . , with
prejudice to the refiling of the claim. 
(c)     If an expert report has not been served within the period
specified by Subsection (a) because elements of the report are
found deficient, the court may grant one 30-day extension to the
claimant in order to cure the deficiency. . . . 
Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (Vernon Supp. 2008).

          The expert report requirement may be satisfied by serving multiple reports, as
follows:

Notwithstanding any other provision of this section, a claimant may
satisfy any requirement of this section for serving an expert report by
serving reports of separate experts . . . regarding different issues arising
from the conduct of a physician . . . , such as issues of liability and
causation. Nothing in this section shall be construed to mean that a
single expert must address all liability and causation issues . . . with
respect to both liability and causation issues for a physician . . . .

 

Id. 74.351(i).         

 
          An “expert report” is a “

written report by an expert that provides a fair summary of the expert’s
opinions as of the date of the report regarding applicable standards of
care, the manner in which the care rendered by the physician . . . failed
to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.

 
Id. 74.351(r)(6) (emphasis added). Section 74.351 defines an “expert,” with respect
to a person giving testimony regarding whether a physician departed from accepted
standards of medical care, as someone qualified to testify under the requirements of
section 74.401. Id. § 74.351(r)(5)(A). 

          Pursuant to section 74.401, “a person may qualify as an expert witness on the
issue of whether the physician departed from accepted standards of medical care only
if the person is a physician who [additional enumerated qualifications].” Tex. Civ.
Prac. & Rem. Code Ann. § 74.401(a) (emphasis added). A trial court may depart
from this criteria “if, under the circumstances, the court determines that there is a
good reason to admit the expert’s testimony” and the court states on the record the
reason for admitting the testimony. Id. 74.401(d). Section 74.401 provides, in
relevant part, that “[a] pretrial objection to the qualifications of a witness under this
section must be made not later than . . . the 21st day after the date the objecting party
receives a copy of the witness’s curriculum vitae . . . .” Id. § 74.401(e). 

 
C.      Analysis

          Here, Beckwith’s burden as a health-care-liability claimant was to timely serve
Dr. White with “one or more expert reports, with a curriculum vitae of each expert.”
See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The parties do not dispute that
Beckwith timely served Dr. White with the reports of Drs. Warner and Fisher. 

          Dr. White contends that because Dr. Fisher is not a physician, he is not an
expert under section 74.401, and thus his report is the legal equivalent of “no report”
under section 74.351. Dr. White contends that Beckwith never met her initial burden
to serve an expert report, and therefore he had no duty to object. Conversely,
Beckwith contends that Dr. White’s objection to Dr. Fisher’s qualifications go to the
sufficiency of the report and that Dr. White had a duty to timely raise such objection,
which he failed to do.

          Applying section 74.351(a), once Dr. White’s “conduct [was] implicated in a
report,” Dr. White’s burden arose to “file and serve any objection to the sufficiency
of the report not later than the 21st day after the date it was served.” See id. 

          The term “implicated” is not defined in Chapter 74. Section 74.001 provides
that, “[a]ny legal term or word of art used in this chapter, not otherwise defined in this
chapter, shall have such meaning as consistent with the common law.” Tex. Civ.
Prac. & Rem. Code Ann. § 74.001(b) (Vernon 2005). The term “implicate” is
defined in common usage as “[t]o show (a person) to be involved in.” Black’s Law
Dictionary 757 (7th ed. 1999). Although somewhat loosely defined at common
law, a defendant’s conduct is implicated when an expert report is “directed primarily”
to care provided by the defendant, Ogletree v. Matthews, 262 S.W.3d 316, 318 (Tex.
2007), and the report informs the defendant of specific conduct called into question
and provides a basis for the trial court to determine that the claim has merit. Am.
Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 876–80 (Tex. 2001). 
If an allegedly deficient report implicates the defendant, the twenty-one day deadline
to object to the sufficiency of the report is triggered. Maris v. Hendricks, 262 S.W.3d
379, 386 (Tex. App.—Fort Worth 2008, pet. denied). 

          Here, Dr. Fisher states in his report that 

[t]he i.r. coagulator used in this case with Anna Beckwith was in my
opinion not the proper choice for tattoo removal. . . . What Dr. White did
by using the i.r. coagulator was to cause thermal death of the skin of
Mrs. Beckwith by heat. . . . In my opinion, any competent laser
dermatologist physician would know the proper equipment and
technique to use.

 
In Ogletree, nurses’ reports that were “directed primarily to the care provided” and
that “outlined various alleged failures” implicated the defendants’ conduct therein.
262 S.W.3d at 318, 322. Here, because Dr. Fisher’s report is primarily directed to Dr.
White’s choice of the infrared coagulator to remove a tattoo from Beckwith’s leg, Dr.
White’s conduct is implicated.


 Hence, Dr. White’s burden to timely assert any
objections to the sufficiency of the report was triggered. 

          Dr. White contends that his objection to Dr. Fisher’s qualifications does not go
to the sufficiency of the report; rather, that Dr. Fisher’s status as a non-physician is
per se fatal to whether Beckwith satisfied her initial burden to serve an expert report. 

          Generally, section 74.401(a) requires that “an expert witness on the issue of
whether the physician departed from accepted standards of medical care” be a
physician. Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a). However, pursuant to
section 74.401(d), a trial court may depart from the criteria at section 74.401(a), “if,
under the circumstances, the court determines that there is a good reason to admit the
expert’s testimony” and the court states on the record the reason for admitting the
testimony. Id. § 74.401(d). Section 74.401(e) clearly provides that “[a] pretrial
objection to the qualifications of a witness under this section” is subject to a 21-day
deadline. See id. § 74.401(e) (emphasis added). Here, Dr. White was required to
assert any objection to Dr. Fisher’s qualifications as a non-physician within 21 days
of receiving Dr. Fisher’s curriculum vitae. See id. § 74.401(a), (e); see also Tex. Civ.
Prac. & Rem. Code Ann. § 74.351(a); Ogletree, 262 S.W.3d at 322 (concluding that
objection that nurses, as non-physicians, were not qualified to render opinion as to
causation under statute “are directed to the report’s sufficiency” and “could have been
urged within the statutory twenty-one day period, as the statute clearly requires”). 

          It is undisputed that Dr. White was served with the expert report and
curriculum vitae of Dr. Fisher on October 30, 2007 and that Dr. White did not raise
any objection to Dr. Fisher’s qualifications until seven months later, on April 22,
2008. We conclude that Dr. White’s objections were untimely and therefore are
waived. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).

          We hold that the trial court erred by dismissing Beckwith’s suit on the basis of
the sufficiency of her expert reports.




Conclusion

          We reverse the judgment of the trial court and remand for proceedings
consistent with this opinion. 





                                                             Laura Carter Higley

                                                             Justice



Panel consists of Justices Jennings, Keyes, and Higley.