

# NUMBER 13-21-00135-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

OCTAVIO AGUILERA; THE SCHUMACHER
GROUP OF TEXAS, INC.; VHS HARLINGEN
HOSPITAL COMPANY, LLC D/B/A VALLEY
BAPTIST MEDICAL CENTER-HARLINGEN;
ADRIAN ALANIZ; KRISTEN WHITE;
GEORGE HUDDLESTON, IV, M.D.;
AND WILLIAM TAW, M.D.,                                       Appellants,

v.

ELIAZAR COSTILLA, INDIVIDUALLY AND
AS THE REPRESENTATIVE OF THE ESTATE
OF KRISTY RENEE COSTILLA, DECEASED,
AND AS NEXT FRIEND OF A.J.C. AND C.K.C.,
MINORS; MELINDA RODRIGUEZ LEAL;
AND CAMILO TREVINO,                                       Appellees.

## On appeal from 197th District Court
## of Cameron County, Texas.

# CONCURRING AND DISSENTING MEMORANDUM OPINION

### Before Justices Benavides, Tijerina, and Peña
### Concurring and Dissenting Memorandum Opinion
### by Justice Benavides

Because the majority sets too high a bar for a tool intended only to weed out frivolous claims, I respectfully dissent in part as to Dr. Taw, Nurses White and Alaniz, and VBM, and I would affirm as to these health care providers.[1]

### I.    PURPOSES OF THE EXPERT REPORT REQUIREMENT

The trial court need only grant a motion challenging the adequacy of an expert report if the report does not represent an objective good faith effort to provide "a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*), (r)(6).

"The TMLA dismissal provisions were not intended to create a 'procedural minefield'; instead, they function 'as a gatekeeper' to flag frivolous cases for which no qualifying expert has been obtained while allowing nonfrivolous cases to move forward." *Shiloh Treatment Ctr., Inc. v. Ward*, 608 S.W.3d 337, 341 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). "The requirement of producing a compliant expert report before discovery is allowed to go forward has been described as a 'low bar' and does not prohibit a defendant from later seeking summary judgment following discovery." *Morrison v.*

---

[1] I agree with the majority that the expert reports constitute "no report" as to Aguilera, SGT, and Dr. Huddleston.

*Asamoa*, 648 S.W.3d 628, 642 (Tex. App.—Eastland 2022, no pet.); *see also Curnel v. Hous. Methodist Hosp.-Willowbrook*, 562 S.W.3d 553, 562–63 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (op. on reh'g) ("Thus, the requirements of the statute have been variously described as a 'lenient standard,' 'low threshold,' and 'relatively low bar.'" (footnotes omitted)). "The question is not whether [plaintiffs] have adequately *proved* their claims but, rather, whether they have adequately *stated* their claims against [defendants]." *Morrison*, 648 S.W.3d at 643.

One of the purposes of the expert report requirement is to "inform the defendant of the specific conduct the plaintiff has called into question." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). Nurses White, Alaniz, VBM, and Dr. Taw all plainly acknowledge in their briefing the conduct appellees question. Dr. Taw writes that "Dr. Halbach claimed that Dr. Taw should have taken images of the left carotid artery" and describes the other claimed breach as "[t]he [a]lleged [i]mproper [d]escription of the [a]neurysm." (Emphasis omitted). Nurses White and Alaniz clearly and succinctly lay out the conduct implicated as (1) "Nurse White failed to recommend to a physician or request an emergency CT scan after Mrs. Costilla exhibited signs of rebleed between 3:10 a.m. and 3:40 a.m."; (2) "Nurse White failed to complete an ordinary CT scan at the time ordered by Dr. Tekle – 6:30 a.m."; (3) "After the morning shift change, Nurse Alaniz failed to complete the ordinary CT scan order until 8:00 a.m."; and (4) "Nurse Alaniz did not maintain [Kristy]'s fluid status between 7:00 a.m. and 7:00 p.m." If these healthcare providers are clearly aware of the deficient behavior alleged by the appellees, then it is axiomatic that appellees have sufficiently apprised them of the specific conduct

3

called into question. *See id.*

The second purpose of the expert report requirement is to provide a basis for the trial court to conclude that the plaintiffs' claims have merit. *Id.* By not dismissing the claims before us, the trial court obviously concluded that the claims have merit, and we should exercise restraint in substituting our judgment for that of the trial court. *See E.D. ex rel. B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022).

## II.  ANALYSIS

The majority remands the case for consideration of a thirty-day extension as to Dr. Taw, Nurses White and Alaniz, and VBM, because it concludes that the expert reports are deficient as to different required elements. For the sake of completeness, I will address the reports' sufficiency as to all of the required elements; e.g., the standard of care, breach of that standard of care, and causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

## A.  Dr. Taw

The majority states that "[w]e are left to speculate whether Dr. Taw identified the aneurysm as being in the right region when there was no aneurysm in the right region, whether Dr. Taw was required to identify the aneurysm in *both* regions, or Dr. Taw should have determined that the aneurysm was only located in the left region."

I do not agree that the report requires any speculation on our part. The purpose of explaining the standard of care in an expert report is to inform the physician of what he should have done differently. *See Palacios*, 46 S.W.3d at 880 ("Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be

4

determined absent *specific information about what the defendant should have done differently*." (emphasis added)); *Baty v. Futrell*, 543 S.W.3d 689, 695 (Tex. 2018) (disagreeing with the lower court "that more was required" to show the standard of care "than merely stating that Futrell should not have inserted the retrobulbar needle into the optic nerve"). There is no requirement that an expert report include the magic words: "The standard of care is x." *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002) (per curiam) ("[A] report's adequacy does not depend on whether the expert uses any particular 'magical words.'").

Here, the reports explain exactly what Dr. Taw should have done differently and why it should have been done differently. According to Dr. Halbach, Dr. Taw fell "below the standard of care" because he did not obtain images of the "left internal carotid artery which . . . would have shown the correct location of the aneurysm . . . , origin[,] and neck attachment," all three of which are "important in deciding subsequent treatment." Had these images been obtained, they would have shown "detailed pictures of the weakened blood vessel." And the failure to obtain these images "prevented recognition of a possibly treatable aneurysm" and "precluded an easier treatment of her aneurysm from inside of [the] blood vessels."

Additionally, although the origin of the aneurysm was visible on the imaging that was obtained, Dr. Taw "incorrectly described the aneurysm as in the region of the anterior cerebral artery." Dr. Cruz explains that the correct location was the "left A1 segment." According to Dr. Cruz, that "particular anatomic location of the aneurysm is very accessible for surgical clipping and/or [the] interventional radiology procedure of coiling."

Dr. Halbach's report further explains that both surgical clipping and coiling "are [the] standard of care and would have prevented rebleeding." Dr. Cruz states that "[i]ncredibly, n[either] of these life[-]saving procedures were pursued." In other words, Dr. Taw *should have* obtained images of the left internal carotid artery and he *should have* identified the correct location of the aneurysm, so that surgical clipping and/or coiling could have been performed. *See Palacios*, 46 S.W.3d at 880; *see also Baty*, 543 S.W.3d at 695 ("If 'sticking [the optic nerve] with the retrobulbar needle' is a breach of the standard of care . . . then the 'proper manner' necessarily encompasses *not* sticking the optic nerve with the retrobulbar needle."). However, he did not do any of these things.

The majority concludes that because Dr. Cruz's report does not mention Dr. Taw or specifically reference his conduct, it cannot "give insight as to how Dr. Taw's actions caused Kristy's injuries." But "expert reports should be read together when determining whether they represent a good faith effort to satisfy the statute." *McKellar v. Cervantes*, 367 S.W.3d 478, 489 (Tex. App.—Texarkana 2012, no pet.). In reading Dr. Cruz and Dr. Halbach's reports together, it is obvious that had Dr. Taw obtained images of the weakened blood vessels, either surgical clipping or coiling would have been performed, which would have prevented rebleeding and, according to the experts, saved Kristy's life.

The reports state that "[t]he failure to obtain these images (pictures) prevented recognition of a possibly treatable aneurysm," the aneurysm "could have been treated at that time by either surgical clipping" or coiling, and these "life[-]saving" treatments "would have prevented rebleeding." In their reports, Dr. Cruz and Dr. Halbach both explain that the rebleeding led to increased cranial pressure, which Dr. Cruz ties directly to the specific

6

brain herniation(s) that caused Kristy's death.

Specifically, Dr. Cruz states that "[i]t was obvious, in my opinion, that [Kristy's] aneurysm most likely started to bleed and there was impending significant increase in intracranial pressure." Dr. Halbach states that "[t]he buildup of fluid around the brain can increase the pressure inside of the skull and produce acute neurological change and death if untreated." Finally, Dr. Cruz states that Kristy likely "died of uncal and/or subfalcine brain herniation" which are both the results of uncontrolled "increased intracranial pressure." In other words, Dr. Taw's failure to identify the aneurysm led to a cascading series of events that ultimately resulted in Kristy's death.

In *Abshire v. Christus Health Southeast Texas*, 563 S.W.3d 219, 225 (Tex. 2018), the supreme court discussed their holding in *Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510 (Tex. 2017), which further demonstrates the validity of a multi-step causal chain:

> In that case, a resident of an assisted-living facility swallowed her dental bridge and died shortly after it was extracted. *Id.* at 512. Although x-rays revealing the bridge's presence in the patient's trachea had been taken when she began showing signs of chest congestion, the reviewing physician failed to notice or identify the problem. *Id.* The expert reports concluded that the physician breached the standard of care by failing to detect the dental bridge in the x-rays and that the corresponding delay in discovering and removing the bridge caused a series of pulmonary issues that ultimately resulted in the patient's death. *Id.* at 514. We held that this was a "more-than-adequate summary" of causation, as it explained how the physician's breach—failing to identify the bridge and alert appropriate personnel—delayed timely removal which in turn caused the patient to aspirate. *Id.* at 515.

*Abshire*, 563 S.W.3d at 225 (discussing *Miller*, 536 S.W.3d at 512, 514–15). Here, Dr. Taw's mistake was the failure to timely diagnose her ruptured aneurysm, which eventually

led to her death. *See Windrum v. Kareh*, 581 S.W.3d 761, 777 (Tex. 2019) (holding that the *"*failure to properly diagnose and treat can be a substantial factor in causing injury in a medical malpractice case").

As the majority rightly points out, all the report needs to do at this stage is (1) inform the defendant of the specific conduct the plaintiff has called into question (here, the failure to obtain images of the left internal carotid artery and the failure to correctly identify the location of the aneurysm, which Dr. Taw acknowledged in his own briefing); and (2) provide a basis for the trial court to conclude that the claims have merit (here, because images of the left internal carotid artery were not obtained and because the correct location of the aneurysm was not identified, surgical clipping and/or coiling was not performed, rebleeding was not prevented, and Kristy died). *See Palacios*, 46 S.W.3d at 879. I do not believe we must conclude, as the majority does, that Dr. Halbach's report is not criticizing Dr. Taw as being responsible for these failures when Dr. Halbach discusses them in a section of his report dedicated solely to Dr. Taw's actions. *Cf. Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 281 (Tex. App.—Austin 2007, no pet.) ("Had Dr. Corove referenced only actions by Dr. Kessler in the background section of his report, the link between Dr. Corove's opinions and the responsible physician might be more apparent.").

Because the reports, when read together, adequately address the standard of care, breach, and causation elements, I would affirm as to Dr. Taw.

## A.      Nurse White

According to Nurse Griffith's report, the "[a]pplicable standard of care would be for [Nurse White] to request an emergent head CT when these changes in the patient status

occurred." But the experts all agree that no emergent CT scan was requested.

The majority states that "the experts opined that a *physician* should have obtained an emergent CT scan, not White or Alaniz." However, this directly contradicts Griffith's statement that the appropriate standard of care required Nurse White "to request an emergent head CT." *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015) ("[T]he trial court had discretion—indeed it was incumbent on the trial court—to review the report, sort out its contents, resolve any inconsistencies in it, and decide whether the report demonstrated a good faith effort to show that the Van Nesses' claims had merit."); *see also PIRF Operations, LLC v. Kerr*, No. 05-20-00887-CV, 2021 WL 2801453, at *8 (Tex. App.—Dallas July 2, 2021, no pet.) (mem. op.) ("Based on *Van Ness*, to the extent Kerr's expert reports are inconsistent or contradictory, the trial court was within its discretion in resolving these issues in Kerr's favor.").

Additionally, there are several places in the physicians' reports where the conduct of Nurse White—the failure to request a CT scan—is implicated. For instance, in Dr. Halbach's report, he states, "[t]he finding of fixed and dilated pupils should have prompted an emergency CT scan of the brain" and Kristy's "clinical decline with a history of a recently ruptured cerebral aneurysm and CT evidence of early hydrocephalus mandated an emergency CT." According to Nurse Griffith, Nurse White is the individual who monitored Kristy's clinical decline and discovered Kristy's pupils had become fixed and dilated. Dr. Cruz stated that when symptoms indicating her clinical condition was deteriorating became apparent, "[a]n immediate CT scan of the brain should have been done." Again, Nurse Griffith's report indicates that Nurse White was the first health care

9

provider to discover Kristy's clinical condition was rapidly deteriorating. Although they do not explicitly name her, the physicians' reports definitively implicated Nurse White's conduct. *See Beckwith v. White*, 285 S.W.3d 56, 62 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("[A] defendant's conduct is implicated when an expert report is 'directed primarily' to care provided by the defendant, . . . and the report informs the defendant of specific conduct called into question and provides a basis for the trial court to determine that the claim has merit." (citation omitted)).

In their briefing, appellants focus on White's status as a nurse, and argue that requesting an emergent CT scan was outside the scope of her responsibilities as a nurse. There are several reasons this argument is unpersuasive: (1) White did not object to the expert report below on this basis, *see* TEX. R. APP. P. 33.1; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (explaining that a defendant health care provider whose conduct is implicated in an expert report must file and serve any objections to the sufficiency of the report by a certain date "failing which all objections are waived"); *Thompson v. Fong*, 650 S.W.3d 164, 168 (Tex. App.—El Paso 2021, pet. denied) ("Given appellant failed to raise the issue the expert reports did not constitute 'expert reports' in the trial court, . . . [a]ppellant has failed to preserve her issue for our review."); (2) any information concerning White's inability to request emergent CT scans does not appear within the four corners of the experts' reports, *see Palacios*, 46 S.W.3d at 878 ("Because the statute focuses on what the report discusses, the only information relevant to [our] inquiry is within the four corners of the document."); and (3) even if White is unable to request emergent CT scans, the report is not subject to attack on this basis. *See Vill.*

*Green Alzheimer's Care Home, LLC v. Graves ex rel. Graves*, 650 S.W.3d 608, 613 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) ("Notably, an expert's report is not subject to attack for stating the wrong standard of care."); *see also Miller*, 536 S.W.3d at 516–17 ("At this preliminary stage, whether those standards [of care] appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort.").

In summary, Nurse Griffith adequately explained that (1) the standard of care for Nurse White required her to request an emergent CT scan at 3:10 a.m.; and (2) Nurse White breached this standard of care by failing to request an emergent CT scan.

Dr. Halbach's report explained the causation element. His report stated that, had a "STAT (urgent) head CT" been performed around 3 a.m., it "would have confirmed a rebleed," but that instead ordering "a brain scan several hour[s]" after her severe neurological decline "prevented any chance of her making a useful recovery." He also opined that "[h]ad [she] been evaluated by a neurosurgeon as requested, and the *rebleeding detected at 3 AM* and treated with a ventricular drain, more likely than not she would not have died." (Emphasis added).

While it is true that a plaintiff must show that the defendant's breach was the proximate cause of her injuries, a plaintiff need not prove that the breach was the *only* cause. *See Windrum*, 581 S.W.3d at 777. An injury may have more than one proximate cause. *Id.* at 778. "[T]he cause-in-fact element of proximate cause is measured by whether the defendant's conduct is too attenuated from the plaintiff's injury to be a substantial factor in bringing about the injury." *Id.* at 780. And the supreme court has held that the "failure to properly diagnose and treat can be a substantial factor in causing injury

11

in a medical malpractice case." *Id.* at 777.

Dr. Halbach's report provides a sufficient causal chain between Nurse White's inaction and Kristy's death. As discussed above, he explained that because Kristy did not receive an emergent CT scan, a timely diagnosis of the rebleeding was not made, which led to Kristy's death. Thus, I believe that appellees adequately showed that Nurse White's failure to request an emergent CT scan was a "substantial factor" in her death. *See id.*; *see also Abshire*, 563 S.W.3d at 226 ("[W]ith respect to causation, the court's role is to determine whether the expert has explained how the negligent conduct caused the injury. Whether this explanation is believable should be litigated at a later stage of the proceedings.").

In my opinion, the expert reports here constitute a good-faith effort to address standard of care, breach, and causation. I would affirm as to Nurse White.

**B.    Nurse Alaniz**

Nurse Griffith's report only states that Nurse Alaniz fell below the standard of care by failing "to complete the head CT . . . at the specified time ordered by Dr. Tekle" and by failing "to maintain a euvolemic fluid status . . . to avoid secondary neurological injury to [the] patient." The reports are more than sufficient as to this second failure.

Nurse Griffith's report explains that the "[a]pplicable standard of care would be to maintain a euvolemic fluid status in order to prevent ischemic complications." This "standard of nursing care for strict intake and output monitoring is important because it helps the medical team evaluate if the fluid volume in the blood is enough to get the required blood flow and oxygen to the brain to maintain adequate oxygenation and

12

prevent ischemic complications." However, according to Nurse Griffith, Nurse Alaniz breached this standard of care because he "fail[ed] to maintain a euvolemic fluid status."

The majority opines that no "expert asserted the alleged failure to maintain Kristy's fluid status had any causal relation to Kristy's death." I disagree. True, no expert stated the fluid imbalance was the immediate cause of Kristy's death, but the supreme court has never "adopted an 'immediate cause' standard." *Windrum*, 581 S.W.3d at 778.

Dr. Cruz discussed in-depth the importance of maintaining a certain balance of fluids when dealing with an injury such as Kristy's:

> Another obvious complication that [Kristy] developed was severe increased intracranial pressure (ICP) which should have been monitored and treated aggressively in a timely fashion. . . . The delicate, steady, increased [ICP] requires *balancing the in-and-out flow of the fluid component* and the balance between the inflow of arterial blood and outflow of venous blood from the head. The early diagnosis and characterization of increased [ICP] is of prime importance in the management of Ms. Costilla. However, again, there was deviation from the standard of care by not providing ICP monitoring. . . . The reason I am insisting on controlling [ICP] is because, if not, the result is brain herniation and secondary death. . . . Anatomically speaking, there are several types of brain herniations, such as transtentorial herniation, uncal herniation, subfalcine herniation, tonsillary herniation. Most likely, [Kristy] died of uncal and/or subfalcine brain herniation. . . . No neurological or neurosurgical notes indicate that this complication was being entertained or that the proper procedures would be taken care of in order to monitor and manage the [ICP]. . . .
>
> . . . .
>
> In summary, the result of these intracranial hemodynamic events led to [ICP] with subsequent progressive brain damage and finally death. In these particular cases, the sooner a diagnosis and treatment is provided to reduce the [ICP] in the brain, the better the outcome.

(Emphasis added). Dr. Halbach also explained that "[t]he buildup of fluid around the brain can increase the pressure inside of the skull and produce acute neurological change and

13

death if untreated," and that here, "there was no blood flow to the brain as the pressure inside the brain caused by the rebleeding was so high that the brain had no oxygen or blood flow."

In layman's terms, the increased pressure in the brain required balancing both the flow of fluids and blood in and out of the body. Because that balance was not maintained, fluid built up around Kristy's brain, the pressure inside the skull increased, and it led to a "brain herniation." According to Dr. Cruz, Kristy most likely died from an "uncal and/or subfalcine brain herniation." Nurse Griffith opined that it was Nurse Alaniz's duty to monitor and maintain a certain euvolemic fluid status in Kristy. But this was not done. Thus, per Dr. Cruz, Kristy died from a herniation that resulted from improper management of increased pressure in the brain, pressure that resulted from an imbalance in fluids that Nurse Alaniz was responsible for balancing. *See Windsor v. Maxwell*, 121 S.W.3d 42, 48 (Tex. App.—Fort Worth 2003, pet. denied) ("It is sufficient that the report contains information summarizing and explaining the causal relationship between the [health care provider]'s failure to meet the applicable standards of care and the plaintiff's injury." (citing *Wright*, 79 S.W.3d at 53). Based on the adequacy of the expert reports, I would affirm as to Nurse Alaniz.

## C. VBM

Because I would affirm as to Nurses White and Alaniz, I would necessarily affirm as to VBM, whom plaintiffs assert was vicariously liable for the nurses' negligence. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013) ("[A]n expert report that adequately addresses at least one pleaded liability theory satisfies the statutory

14

requirements, and the trial court must not dismiss in such a case.").

### III. CONCLUSION

In response to the majority's criticisms of this dissent, I reiterate that this is not the appropriate stage of the proceedings to litigate the merits of the underlying health care liability claim. *See Miller*, 536 S.W.3d at 517 ("Whether each defendant is liable for Hathcock's death is not the question at this stage; that will be answered further in the litigation process."). The only question is whether the expert reports here constituted a "good faith effort" to comply with the statutory definition of an expert report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*). The majority would decide this issue differently than the trial court, that is painfully obvious. But because we review this issue for an abuse of discretion, we may reverse only if the lower court's decision was arbitrary and unreasonable. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) ("Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable.").

"The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011). Because the majority does not affirm as to Dr. Taw, Nurses White and Alaniz, and VBM, they are implying, necessarily, that if the experts do not amend their reports, the plaintiffs' claims are frivolous and must be dismissed. *See id.* Based on the three detailed expert reports presented, I believe that it was neither arbitrary nor unreasonable for the trial court to decide that the plaintiffs' claims were not frivolous. *See Walker*, 827 S.W.2d at 840. And to the extent that decision might be considered a close call, "[c]lose

15

calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) (per curiam). For the reasons stated herein, I would affirm as to Dr. Taw, Nurses White and Alaniz, and VBM. Thus, I respectfully dissent in part.

GINA M. BENAVIDES
Justice

Delivered and filed on the
30th day of March, 2023.

16