

# NUMBER 13-23-00300-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

NEONATOLOGY CONSULTANTS
OF CORPUS CHRISTI, PLLC; ALFONSO
M. PRADO, M.D.; MIGUEL A. DELEON,
M.D.; EUMING CHONG, M.D.;
JIE GUO, M.D.; VALLIER C. OJADI, M.D.,                    Appellants,

v.

FELIX MOYA AND SERENA LEE
BARRAGAN, INDIVIDUALLY AND AS
NEXT OF FRIENDS OF XXXXXXXXXXXX
XXXX, A MINOR,                                           Appellees.

## ON APPEAL FROM THE 105TH DISTRICT COURT
## OF NUECES COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Justices Longoria, Tijerina, and Peña**
**Memorandum Opinion by Justice Tijerina**

Appellants Neonatology Consultants of Corpus Christi, PLLC; Alfonso M. Prado,

M.D.; Miguel A. DeLeon, M.D.; Euming Chong, M.D.; Jie Guo, M.D.; Vallier C. Ojadi, M.D. (collectively appellants) appeal the trial court's denial of their Chapter 74 motions to dismiss healthcare liability claims brought by appellees Felix Moya and Serena Lee Barragan, Individually and as Next of Friends of Audrey,[1] a Minor (collectively appellees). Appellants assert the appellees' expert report fails to "demonstrate a 'good-faith' effort to set forth the specific conduct being called into question for each specific" appellant and "failed to set forth how the alleged breach . . . proximately caused alleged injuries" in violation of § 74.351 of Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (providing for expert report requirements in health care liability actions); *id.* § 51.014(a)(9) (providing for interlocutory appeal of an order denying relief under § 74.351). We affirm.

## I.  BACKGROUND

Audrey was born on January 26, 2017, at Corpus Christi Medical Center with significant and cyanotic congenital heart defects. Prior to Audrey's birth, a fetal echocardiogram revealed that Audrey would suffer from tricuspid atresia, double outlet right ventricle (DORV), d-malposed great vessels, hypoplastic pulmonary valve annulus in the main pulmonary artery and branch pulmonary arteries with a mild pulmonary stenosis, hypoplastic right ventricle (RV), a large ventricular septal defect (VSD), a large atrial septal defect (ASD) with aneurysmal septum, a medium patent ductus arteriosus (PDA), a left aortic arch, and a possible single coronary artery. She was transferred to Driscoll Children's Hospital (DCH) to be treated by pediatric cardiologists and

---

[1] We use a pseudonym to refer to the minor child.

neonatologists that same day and remained at DCH through March 6, 2017. Audrey was admitted to DCH again on May 22, 2017, through July 19, 2017.

On January 22, 2019, appellees filed a healthcare liability claim against several medical professionals and entities, including appellants. Appellees alleged that because of appellants' negligent conduct, Audrey suffered severe and permanent injuries. Appellees filed two expert reports by Ezequiel D. Salinas, III, M.D. and William D. Rhine, M.D. in accordance with § 74.351. *See id.* § 74.351(a) ("In a health care liability claim . . . a claimant shall . . . serve on [a defendant health care provider] one or more expert reports, with a curriculum vitae [CV] of each expert listed in the report."). Dr. Salinas's report addressed another group of healthcare providers who are not parties to this appeal. Thus, only Dr. Rhine's expert report is relevant to this appeal.

On June 19, 2019, appellants filed objections to appellees' expert report and motions to dismiss arguing that the expert report failed to set forth a standard of care and an alleged breach as to their actions specifically. They further asserted the expert report was speculative and conclusory as to proximate cause. Following a hearing, the trial court denied appellants' motions to dismiss on September 17, 2020. The trial court subsequently vacated this order on October 6, 2020.[2] On June 12, 2023, the trial court entered an amended order denying appellants' objections to the expert reports and denying their motions to dismiss. This appeal followed.

---

[2] In its order vacating the September 17, 2020 order, the trial court granted the University of Texas Medical Branch at Galveston's motion to dismiss with prejudice.

3

## II.     STANDARD OF REVIEW & APPLICABLE LAW

Texas Civil Practice and Remedies Code provides that a plaintiff in a health care liability suit must serve the medical defendant with an expert report that complies with § 74.351 and is accompanied by the expert's curriculum vitae. *See id.* § 74.351. If a plaintiff fails to do so within 120 days after the defendant's original answer is filed, then the trial court must dismiss the claim with prejudice on the defendant's motion. *Baty v. Futrell*, 543 S.W.3d 689, 692 n.1 (Tex. 2018); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (b)(2).

The goal is "to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (citing *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011)); *see also Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam). Therefore, the expert report requirement is a low threshold that merely demonstrates that a claim is not frivolous. *Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012). It must provide a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

"A trial court must sustain a challenge to a report's adequacy if the report does not represent an objective good faith effort to provide a fair summary of the applicable standard of care, the defendant's breach of that standard, and how that breach caused

4

the patient's harm." *Miller v. JSC Lake Highland Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017) (per curiam) (cleaned up); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6). "A good-faith effort must 'provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide the basis for the trial court to conclude that the claims have merit." *Miller*, 536 S.W.3d at 513 (quoting *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam)). All information needed for this inquiry is found within the four corners of the expert report, which need not marshal all the plaintiff's proof. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010) (citing *Am. Transitional Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)). A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. *Palacios*, 46 S.W.3d at 879; *New Med. Horizons, II, Ltd. v. Milner*, 575 S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *see Scoresby*, 346 S.W.3d at 556 ("No particular words or formality are required, but bare conclusions will not suffice.").

If there are multiple defendants in a suit, the report must be sufficient as to each defendant individually. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *see also Rivenes v. Holden*, 257 S.W.3d 332, 336 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding that if a plaintiff does not serve a report to a particular defendant, the trial court must dismiss that defendant from the suit). A report to a particular defendant must implicate the defendant's conduct. *Ogletree v. Matthews*, 262 S.W.3d 316, 322 (Tex. 2007). A report served in a healthcare liability claim, however, does not implicate a defendant's conduct merely because the provider is a named defendant in the lawsuit. *Id.*

"[A] defendant's conduct is implicated when an expert report is 'directed primarily' to care provided by the defendant, and the report informs the defendant of specific conduct called into question and provides a basis for the trial court to determine that the claim has merit." *Beckwith v. White*, 285 S.W.3d 56, 62 (Tex. App.—Houston [1st Dist.] 2009, no pet) (citation omitted).

We review a trial court's ruling on the sufficiency of an expert's report and on a motion to dismiss for an abuse of discretion. *Jelinek*, 328 S.W.3d at 539; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *Miller*, 536 S.W.3d at 512. A trial court abuses its discretion if its acts are arbitrary or unreasonable and without reference to any guiding rules or principles. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017).

### III.    ANALYSIS

By their sole issue, appellants argue the trial court erred when it denied their objections to appellees' expert report and denied their motions to dismiss. Specifically, appellants argue that the expert report does not represent a good faith effort to inform appellants "of what care is being called into question," "how that specific care proximately caused any alleged injury," "does not specify allegations against each [appellant] individually," and does not "explain, factually, how proximate cause was going to be proven against each defendant."

### A.    Breach of the Standard of Care

Appellants state that the report must fail because it "did not implicate each [appellant's] particular conduct in [Audrey's] treatment that led to her alleged injuries." However, Dr. Rhine's report criticizes the actions of *all* of the neonatologists in the same

6

fashion. Dr. Rhine stated that all of the neonatologists "examined the infant [Audrey] on different days between her birth up to an including the day of her code event on February 4, 2017 to her emergent surgery." He further explained that Dr. Prado was the initial birth hospital treating physician who referred Audrey to be transported to DCH while Dr. Ojadi was the admitting physician at DCH. Dr. Rhine established that appellants were all neonatologist physicians, rotated in their care of Audrey, "consulted with one another and reviewed [Audrey's] status from January 26, 2017, to through February 4, 2017," and adopted, continued, and agreed with the plan of care.

Dr. Rhine explained that Audrey's status posed a "significant problem that would not self-resolve," such that it required prompt assessment and a cardiovascular surgical repair plan. Despite appellants' knowledge of Audrey's complex CHD status—which required surgical repair at the earliest possible opportunity after birth—appellants did not plan or schedule a cardiac repair surgery. Instead, Dr. Prado's transfer order to DCH merely stated that Audrey needed a "specialized treatment or [sic] care, continuity of care, and further medical exam." According to Dr. Rhine, "each and all of these physicians . . . should have known that the standard of care for an infant with very complex CHD required that she receive the highest level of care possible, with a documented need for complex neonatal cardiac repair surgery." The expert report states that "all [appellants] were aware that [Audrey] required complex BT Shunt repair surgery from the date of her admission," and given her status, each appellant "should have known . . . she might require PGE1 to maintain respiratory function up to the time of her known required cardiac repair surgery."

7

"[G]rouping defendants together in discussing the relevant standards of care" as Dr. Rhine did here, "does not render an expert report inadequate when all the defendants owed the same duty to the plaintiff." *Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 367 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Here, Dr. Rhine makes it clear that appellants who are all neonatologists failed to schedule cardiac repair surgery entirely— despite the critical urgency in scheduling it immediately after birth. He states that appellants "continuously fail[ed] to ensure that the necessary heart repair surgery essential to [Audrey's] life was planned/scheduled on each and every day of her admission prior to her code/collapse." *See Sanjar v. Turner*, 252 S.W.3d 460, 466–67 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that the same standard of care may be applied to more than one physician if they all owed same duty to patient).

Moreover, Dr. Rhine opined as to the breach of the standard of care as follows:

> the standard of care requires that PGE1 be administered in a timely manner to maintain adequate respiratory status up to the repair surgery, and at the appropriate dose. As Dr. Chong noted, that extremely high dose resulted in critical hypotension. The standard of care was clearly breached by these neonatologists who continuously failed to initiate the PGE1 until the time of her code, and then an extreme dose was administered, making her pre-surgical status even more precarious. The standard of care requires that the neonatologists monitor [Audrey's] respiratory status closely and initiate the appropriate treatments to prepare [Audrey] for her surgery. It is my expert opinion, within reasonable medical probability, that these neonatologists breached the standard of care in waiting until a code event to administer PGE1, which resulted in the least optimal clinical status for complex cardiac surgery, with attendant impaired recovery potential.

Thus, the report expressly references the "specific conduct the plaintiff has called into question." *Baty*, 543 S.W.3d at 695. The report further provides that although there was a standing order for the administration of PGE1, it was discontinued on February 2, 2017,

8

and "negligently not re-instated by the neonatologists." Dr. Rhine asserted that the failures of Drs. Ojadi and Chong to reinstate the standing order and to monitor the medical chart to ensure that PGE1 was included and implemented is a significant breach of the standard of care. Although Audrey's respiratory function goal "was not met . . . there is no entry for any PGE1 administration until February 4, 2017." *See Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("There is nothing inherently impermissible about concluding that different health care providers owed the same standard of care . . . and breached that duty in the same way.").

Furthermore, Audrey was given "ten times the acceptable dose," which is a "significant breach of the standard of care." According to Dr. Rhine, Dr. Chong "should have been aware that this excessive dose would directly cause the critical hypotension that [Audrey] suffered, resulting in increased deterioration to her code status."

Dr. Rhine clearly states all appellants in "this physician group" failed to: (1) "ensure the timely and essential/mandatory administration of PGE1 in accord with the standing order . . . prior to her code/respiratory collapse when the PDA closed during the night shift on February 4, 2017"; (2) "act upon [Audrey's] O2 Flowsheets, Lab Results Flowsheets, and Oxygenation Notes to determine the degree of her respiratory status was which [sic] ductal dependent and the necessity of the PGE1 initiation"; (3) "re-instate the PGE1 standing order when it had been discontinued on February 2, 2017" resulting in "the delay of PGE1 from the initial critical desats which began at 0100 to the placement of the new order . . . at 0646, which was not administered until 0800 on February 4, 2017"; (4) "monitor the status of her PDA with sequential echocardiograms when her need for NC

9

O2 was documented"; and (5) "ensure that the necessary heart repair surgery essential to her life was planned/scheduled on each and every day of her admission prior to her code/collapse."

Based on the foregoing, we conclude the Dr. Rhine's expert report put appellants on notice of what the applicable standard of care was and how appellants breached the applicable standard of care: appellants failed to schedule Audrey's cardiac repair surgery each day that she was admitted; appellants failed to timely administer PGE1; appellants failed to reinstate the PGE1 order; appellants failed to maintain adequate respiratory status; and appellants failed to administer the appropriate PGE1 dose. *See Baty*, 543 S.W.3d at 697. Although there are multiple defendants in this suit, we find the expert report sufficient as to each defendant individually. *Cf. Aguilera v. Costilla*, No. 13-21-00135-CV, 2023 WL 2711129, at *9 (Tex. App.—Corpus Christi–Edinburg Mar. 30, 2023, pet. denied) (holding that where appellants are comprised of diverse medical professionals and entities practicing in different fields of medicine, a "one-size-fits-all" standard of care and a breach of the same will not suffice). Dr. Halbach's expert report does not differentiate between the standards of care for the different physicians. Because the expert report sufficiently put appellants on notice of what care was allegedly required but not given, it sufficiently sets out a standard of care and a breach of that standard. *See Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, 382 S.W.3d 619, 629 (Tex. App.—Fort Worth 2012, no pet.); *see also Palacios*, 46 S.W.3d at 879 (confirming that "the report does not have to meet the same requirements as the evidence offered in a summary-

10

judgment proceeding or at trial").

## B.    Causation and Injury

Appellants argue that the expert report "is not a good-faith' effort to explain, factually, how proximate cause was going to be proven against each defendant."

Dr. Rhine opined that "as a result" of this "continuous pattern of negligent medical care over a period of nine days," Audrey "required a 'prolonged' stay in the NICU, and was discharged with significantly impaired blood gas stability and complex open heart surgery under the worst of circumstances." Moreover, according to Dr. Rhine, if Audrey had received the following interventions: continuous and close monitoring her respiratory status and prompt administration of PGE1; monitoring of PDA status with echocardiograms as indicated; and prompt planning/scheduling of the required corrective surgery prior to any code event, then Audrey "would not have undergone complex open[-]heart surgery under physiological suboptimal conditions, with attendant lessening of optimal outcome/recovery." *See Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("A causal relationship is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and absent the act or omission, the harm would not have occurred."). The report explains that as a result of the appellants' breach of the standard of care, Audrey was an inpatient for over five weeks, and the "insults to her health by undergoing open[-]heart surgery immediately post-code are permanent." According to Dr. Rhine, the "unexplained/negligent delay for over nine days . . . resulted in impaired heart-lung function," which required Audrey to be readmitted when she was four months of age, led

11

to significant problems to her "less-than-optimal post-code open[-]heart surgery on February 4, 2017." Dr. Rhine established that instead, "<u>prompt</u> therapeutic intervention through the administration of PGE1"—when her notes indicated her O2 stats failed—"would have forestalled the foreseeable closure of her PDA, thus allowing proper surgical intervention under much more favorable conditions." *See Gelman v. Cuellar*, 268 S.W.3d, 123, 130 (Tex. App—Corpus Christi–Edinburg 2008, pet. denied) (holding an expert report adequate regarding the breach of standard of care and causation because it explained that if patient had "been properly monitored and timely treated post-operatively with aggressive respiratory care, she would not have developed respiratory insufficiency," which caused her "anoxic brain damage"); *In re Barker*, 110 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, orig. proceeding) (concluding an expert report sufficient because it explained negligent failure to recognize medical condition and the delay in treatment increased the severity of plaintiff's injuries).

In our view, Dr. Rhine provides a straightforward link between appellants' alleged breach of the standard of care and Audrey's injuries. Dr. Rhine stated that cardiac surgical delay and the delayed PGE1 intervention led to Audrey's suboptimal surgical conditions. *See Tenet Hosps. Ltd. V. Barajas*, 451 S.W.3d 535, 547–48 (Tex. App.—El Paso 2014, no pet.) ("The expert report must explain the basis for the causation opinions by linking the expert's conclusions to the alleged breach."). Dr. Rhine explained how appellants' breach—by failing to operate immediately, failing to restart PGE1 timely—in his opinion caused Audrey to be readmitted to the hospital only four months later, causing permanent tissue damage and a lifetime impairment. *See Abshire v. Christus Health Se. Tex.*, 563

S.W.3d 219, 226 (Tex. 2018) (per curiam) (holding that with respect to causation, our "role is to determine whether the expert has explained how the negligent conduct caused the injury"); *Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 512 (Tex. 2017) (per curiam) ("At this preliminary state, whether those standards appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort"). In other words, this is more than a mere conclusory assertion. *See Palacios*, 46 S.W.3d at 879.

## C.    Summary

Because expert reports are simply a preliminary method to show that a plaintiff has a viable cause of action that is not frivolous, we hold that Dr. Rhine's expert report represents an objective good faith effort to inform appellants of the causal relationship between the failure to adhere to the pertinent standard of care and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE. ANN. § 74.351(l). Accordingly, we cannot conclude that the trial court abused its discretion in denying appellants' motions to dismiss. *See Jelinek*, 328 S.W.3d at 539. We overrule appellants' sole issue.

## IV.    CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Justice

Delivered and filed on the
12th day of December, 2024.